Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| BANCO POPULAR DE PUERTO RICO <br><br> Apelado <br><br> v. <br><br> CHRISTIAN DARCOLI PARRELLA Y OTROS <br><br> Apelantes | KLAN202500351 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan <br><br> Sobre: *Cobro de Dinero* <br><br> Civil Núm. SJ2023CV06854 |

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Marrero Guerrero, el Juez Campos Pérez y el Juez Sánchez Báez.

Rodríguez Casillas, juez ponente.

### SENTENCIA

En San Juan, Puerto Rico, a 25 de junio de 2026.

Comparecen ante nos el Sr. Christian Darcoli Parrella ("señor Darcoli Parrella"), la Sra. María L. Serra Collazo ("señora Serra Collazo") y la Sociedad Legal de Bienes Gananciales compuesta entre ambos (en conjunto, "SLG Darcoli-Serra" o "Apelantes"), para que revoquemos de la *Sentencia Sumaria* emitida el **21 de febrero de 2025**, por el Tribunal de Primera Instancia, Sala Superior de San Juan ("TPI").[1] Mediante el referido dictamen, se condenó a los **Apelantes** al pago de $50,000.00 por concepto de principal, más la cantidad de $39,652.19 por concepto de intereses vencidos y $4,000.00 por concepto de honorarios de abogados.

Por los fundamentos que expondremos a continuación, **revocamos parcialmente** el dictamen apelado y **devolvemos** el caso de epígrafe.

---

[1] Notificada el 24 de febrero de 2025.

Número Identificador
SEN2025_____

**-I-**

En o para el año 1999, el **señor Darcoli Parrella** y la **señora Serra Collazo** fundaron el restaurante italiano *Pinoli*. A raíz de ello, crearon una corporación denominada Don Minzoni, Inc. ("Don Minzoni") para la operación del mencionado restaurante. **Don Minzoni** abrió una cuenta bancaria comercial con el Banco Popular de Puerto Rico ("BPPR" o "Apelado") para operar dicho negocio.

Así las cosas, el **7 de abril de 2005**, el **BPPR** le concedió una línea de crédito comercial a la corporación **Don Minzoni** por $50,000 que devengaría intereses a razón de 4% ("FlexiLínea").[2] En esa misma fecha, la **SLG Darcoli-Serra** suscribió una *Garantía Ilimitada y Continua* donde sus miembros corporativos se obligaron a responder personalmente en caso de incumplimiento de pago.[3]

Varios años después, el **20 de abril de 2011** el **BPPR** le concedió a **Don Minzoni** una enmienda a la **FlexiLínea**, en la que aumentó el intereses a razón de 5.50% sobre la tasa de interés primario.[4]

Años más tarde y tras el paso de los huracanes Irma y María en el 2017, los **Apelantes** decidieron cesar las operaciones del restaurante *Pinoli*. Esto provocó el incumplimiento con el pago de la **FlexiLínea** por parte de **Don Minzoni**, por lo que, el **12 de enero de 2018**, el **BPPR** canceló la misma y convirtió el entonces balance de la línea de crédito en un **préstamo** insoluto.

Ante este cuadro, el **27 de agosto de 2019** el **BPPR** presentó contra el **señor Darcoli Parrella**, la **señora Serra Collazo** y la **SLG Darcoli-Serra** una *Demanda* sobre <u>cobro de dinero y ejecución de</u>

---

[2] Apéndice I de la *Apelación*, pág. 5.
[3] Apéndice I de la *Apelación*, pág. 6.
[4] Apéndice I de la *Apelación*, pág. 7.

hipoteca bajo el alfanumérico **SJ2019CV08745**.[5] A continuación transcribimos la misma *in extenso*:

1. Los demandados, son mayores de edad, propietarios y vecinos de Río Piedras, Puerto Rico y según información y creencia están casados entre sí bajo el Régimen de Sociedad de Bienes Gananciales. Las últimas direcciones conocidas de la parte demandada son: **URB. LOS MAESTROS, 752 CALLE JOSE B ACEVEDO, SAN JUAN, PR 00923; PUERTO NUEVO DEV, 414 DE DIEGO AVE, SAN JUAN, PR 00920.**

2. La demandante, **BANCO POPULAR DE PUERTO RICO**, es una institución de financiamiento organizada y existente con arreglo a las leyes del Estado Libre Asociado de Puerto Rico y una subsidiaria propiedad de Popular, Inc. Su dirección postal es PO Box 362708, San Juan, Puerto Rico 00936-2700; dirección física, Edificio Centro Europa, Suite 201, Ave. Ponce de León 1492, Pda.22, San Juan, Puerto Rico 00917 y teléfono (787) 522-0220.

3. La demandante es actual tenedora de un pagaré suscrito solidariamente por la parte demandada, a favor de **R.F. MORTGAGE AND INVESTMENT CORPORATION**, o a su orden, el día **26 de febrero de 2004**, por la suma de **$204,000.00** de principal, que devenga intereses a razón del **6.78%** anual, pagadero mediante un primer plazo a comenzar el día **1ro de abril de 2004** y subsiguientes plazos en igual día de cada mes consecutivo posterior hasta el pago total de la deuda, la cual de no haber sido satisfecha antes, vencerá el día **1ro de marzo de 2011**.

4. Mediante la escritura número **96**, otorgada en San Juan, Puerto Rico, el día **26 de febrero de 2004**, ante el Notario **Enrique N. Vela Colón**, se constituyó hipoteca voluntaria con **carácter de primera**, sobre el inmueble que más adelante se describirá para garantizar el pago de la deuda evidenciada por el pagaré a que se ha hecho referencia en la alegación inmediatamente precedente y sus intereses al tipo pactado antes señalado, más créditos adicionales para intereses en adición a los garantizados por ley, costas, gastos y honorarios de abogado en caso de ejecución o reclamación judicial y para otros adelantos que puedan hacerse dentro del contrato.

5. La referida hipoteca se encuentra inscrita en el Registro de la Propiedad de Puerto Rico, **Sección de San Juan III**, al folio **36** del tomo **969** de Monacillos, finca número **6105**; inscripción **10ma**.

6. El día **8 de abril de 2010** la parte demandada suscribió la escritura número **4** sobre Escritura de Modificación, otorgada en San Juan, Puerto Rico, ante el Notario Público **Rafael Socorro Santoni**, en la cual se modificó el pagaré e hipoteca antes relacionada en cuanto a lo siguiente: a los intereses, los pagos mensuales, el principal será por **$204,000.00** y la fecha de vencimiento el **1ro de abril de 2017**.

7. La referida escritura **4** sobre Modificación de Hipoteca se encuentra inscrita en el Registro de la Propiedad **Sección de San Juan III**, al folio **36** del tomo **969** de Monacillos, finca número **6105**, inscripción **11**.

8. El día **29 de abril de 2017** la parte demandada suscribió la escritura número **126** sobre Escritura de Modificación y Cancelación Parcial de Hipoteca, otorgada en San Juan, Puerto Rico, ante el Notario Público **Félix Joel**

---

[5] Este Tribunal toma conocimiento judicial *motu proprio* del pleito instado, Regla 201 de Evidencia de 2009. 32 LPRA Ap. VI, R. 201. Véase, caso núm. SJ2019CV08745, Entrada Núm. 1 de SUMAC.

**Zambrana Ortiz**, en la cual se modificó el pagaré e hipoteca antes relacionada en cuanto a lo siguiente: a los intereses, los pagos mensuales, el principal será por **$189,182.00** y la fecha de vencimiento el **1ro de mayo de 2037**.

9. La referida escritura **126** sobre Modificación y Cancelación Parcial de Hipoteca se encuentra inscrita al Sistema Karibe, **Sección de San Juan III**, finca número **6105** de Monacillos, inscripción **12**; describiéndose el inmueble de la siguiente forma:

> **URBANA**: Solar de forma rectangular que mide doce punto cero cero (12.00) metros de frente por veintiuno punto cero cero (21.00) metros de fondo, marcado con el número cincuenta y tres (#53) de la Manzana "BO" (ahora Avenida de Diego #414) de la Urbanización Puerto Nuevo, propiedad de la Everlasting Development Corporation, radicada en el Barrio Monacillos del término municipal de San Juan, Puerto Rico, con una superficie de **DOSCIENTOS CINCUENTA Y DOS PUNTO CERO CERO (252.00) METROS CUADRADOS. En linderos: NORTE, SUR, ESTE y OESTE**, con terrenos propiedad de la Everlasting Development Corporation y dando frente al Este con la calle denominada Main Street de la urbanización.[6]

10. La parte demandada no ha cumplido con la forma de pago convenida para el repago del préstamo evidenciado por el pagaré a que se refiere la alegación tercera anterior, garantizado hipotecariamente, según se hace constar en la alegación cuarta precedente. Por esta razón, la parte demandante ha declarado vencida la totalidad de la deuda de conformidad con los términos del susodicho pagaré y en su consecuencia, la parte demandada adeuda solidariamente a la demandante la suma de **$186,594.88**, balance de principal del referido pagaré, los intereses que al tipo convenido del **7%** anual devengado sobre dicha suma desde el **1ro de enero de 2018** y los que se devenguen hasta su total y completo pago, los cargos por demora incurridos hasta esta fecha y los que se devenguen hasta el total y completo pago de la deuda, y los adelantos hechos por el demandante para el pago de primas de seguro, contribuciones sobre la propiedad, contribuciones especiales, cualquier otro gasto desembolsado por la parte demandante y las costas, gastos y honorarios de abogado del demandante conforme éstos fueron pactados en la referida escritura de hipoteca.

11. El adeudo a que se contrae la presente Demanda está vencido, es líquido y exigible y no ha sido satisfecho ni en todo ni en parte por la parte demandada a pesar de los múltiples requerimientos que a tales efectos le ha hecho la demandante.

**EN MÉRITO DE LO EXPUESTO**, la parte demandante respetuosamente solicita de este Honorable Tribunal que, en su día, y previo los trámites de ley correspondientes, declare **CON LUGAR** esta demanda y en su consecuencia dicte sentencia con los siguientes pronunciamientos:

> a) Condenando a la parte demandada a pagar a la demandante la suma de **$186,594.88**, balance de principal del referido pagaré, los intereses que al tipo convenido del **7%** anual devengado sobre dicha suma desde el **1ro de enero de 2018**, y los que se devenguen hasta el total y completo pago del principal, los cargos por demora incurridos hasta esta fecha y los que se devenguen hasta el total y completo pago de la deuda, cualesquiera adelantos hechos por la demandante para el pago de primas de seguro, contribuciones sobre la propiedad, contribuciones especiales, cualquier otro gasto desembolsado por la parte demandante y la suma de **$20,400.00** para costas, gastos

---

[6] Conforme a los documentos que obran en el expediente, el inmueble descrito se trata de la propiedad comercial donde operaba el restaurante *Pinoli*.

y honorarios de abogado del demandante cuyo importe fuera pactado en la referida escritura de hipoteca;

b) Disponiéndose que, de no efectuarse el pago de las sumas adeudadas sobre el inmueble hipotecado, precedentemente descrito, sea vendido en pública subasta y que las cantidades adeudadas a la demandante garantizadas con la hipoteca antes relacionada, le sean satisfechas con el producto de dicha venta; y en caso de que el producto de dicha venta sea insuficiente para satisfacer las sumas adeudadas al demandante se ordene la venta en pública subasta de cualesquiera otros bienes de la parte demandada hasta que cualquier deficiencia o parte insoluta de la sentencia sea totalmente satisfecha;

c) Disponiéndose, además, que, de ser necesaria la venta en pública subasta del referido inmueble, y de efectuarse la misma, el Secretario de este Honorable Tribunal expida el correspondiente Mandamiento dirigido al Registrador del Registro de la Propiedad de Puerto Rico, **Sección de San Juan III** para que éste cancele en los libros a su cargo cualesquiera gravámenes posteriores a la hipoteca que se ejecuta y que afecten el referido inmueble, así como para que cancele el gravamen que se ejecuta;

d) Concediendo cualquier otro remedio a que tenga derecho el demandante de conformidad con las alegaciones de esta demanda.[7]

Tras varios trámites procesales,[8] el **10 de diciembre de 2021** el **BPPR** presentó un *Aviso de Desistimiento Sin Perjuicio* en el caso **SJ2019CV08745** al amparo de la Regla 39.1 de procedimiento Civil.[9] En esa misma fecha, también presentó una *Solicitud de Cancelación de Anotación a Demanda*,[10] en específico, la propiedad inscrita en el Registro de la Propiedad, Sección de San Juan III, al Tomo Karibe de San Juan, finca número 6105, mediante Anotación A:

**URBANA**: Solar de forma rectangular que mide doce punto cero cero (12.00) metros de frente por veintiuno punto cero cero (21.00) metros de fondo, marcado con el número cincuenta y tres (#53) de la Manzana "BO" (ahora Avenida de Diego #414) de la Urbanización Puerto Nuevo, propiedad de la Everlasting Development Corporation, radicada en el Barrio Monacillos del término municipal de San Juan, Puerto Rico, con una superficie de **DOSCIENTOS CINCUENTA Y DOS PUNTO CERO CERO (252.00) METROS CUADRADOS. En linderos: NORTE, SUR, ESTE y OESTE**, con terrenos propiedad de la Everlasting Development Corporation y

---

[7] Véase, Entrada Núm. 1 de SUMAC, págs. 1-3 de 3, Caso Núm. SJ2019CV08745.
[8] Resulta importante señalar que, el 13 de noviembre de 2019, el **BPPR** presentó una SOLICITUD DE TÉRMINO AL AMPARO DE LA REGLAMENTACIÓN FEDERAL DEL "CONSUMER FINANCIAL PROTECTION BUREAU". En resumen, solicitó y obtuvo un término de 60 días para informar el resultado entre las partes sobre el referido al Departamento de Mitigación de Perdidas del Banco, conforme se establece en las normas hipotecarias del *"Consumer Financial Protection Bureau"*, 12 C.F.R. 1024.41, et seq., ("CFPB"). No obra en el expediente de este caso el resultado del mismo. Véanse, Entrada Núm. 11 y 12 de SUMAC, Caso Núm. SJ2019CV08745. Además, este caso fue paralizado por la pandemia del COVID-19. Véanse, además, Entrada Núm. 14 y 15 de SUMAC, Caso Núm. SJ2019CV08745.
[9] Véase, Entrada Núm. 16 de SUMAC, Caso Núm. SJ2019CV08745.
[10] Véase, Entrada Núm. 17 de SUMAC, Caso Núm. SJ2019CV08745.

dando frente al Este con la calle denominada Main Street de la urbanización.

Informó que *llegaron a un acuerdo* con los **Apelantes**, por lo que el **BPPR** solicitó la cancelación de la Anotación de la Demanda.

El **13 de diciembre de 2021**, el **TPI** emitió una *Orden* en la cual declaró *Ha Lugar* la cancelación de Anotación de Demanda.[11] En específico, dispuso:

> En su consecuencia, el Tribunal [...] ORDENA al Registrador de la Propiedad, Sección de San Juan III, que proceda a CANCELAR:
> 1. La Anotación preventiva (Aviso de Demanda) de fecha 27 de agosto de 2019, expedido en el Tribunal de Primera Instancia, Sala de San Juan, en el Caso Civil número SJ2019CV08745, por concepto de Cobro de Dinero y Ejecución de Hipoteca, seguido por el Banco Popular de Puerto Rico, versus Christian Darcolli Parrella, et als, por la suma de $186,594.88, más intereses y otras sumas, anotado el día 30 de septiembre de 2019, al tomo Karibe de Sabana Llana, finca número 6105, Anotación A.
> Se ORDENA a la Secretaria del Tribunal librar el correspondiente Mandamiento dirigido al Registrador de la Propiedad de San Juan, Sección III, para que dé cumplimiento a la presente Orden.[12]

Consecuentemente, ese mismo día, emitió la *Sentencia Final* en la que declaró *Con Lugar* la solicitud de desistimiento *sin perjuicio* del **BPPR** en el caso **SJ2019CV08745**.[13]

Así las cosas, —y transcurrido más de año y medio— el **18 de julio de 2023**, el **BPPR** presentó una segunda y nueva *Demanda* en **cobro de dinero** contra el **señor Darcoli Parrella**, la **señora Serra Collazo** y la **SLG Darcoli-Serra** en el caso de epígrafe **SJ2023CV06854**.[14] En esta ocasión, alegó que el 7 de abril de 2005 se le concedió una **línea de crédito comercial** a la extinta corporación **Don Minzoni** por la cantidad de $50,000.00 identificada como el **Préstamo Comercial #101-2512785-8801**. Adujo que el 20 de abril de 2011 las partes de epígrafe suscribieron una *Enmienda al Pagaré de Línea de Crédito FlexiLínea o al Contrato*

---

[11] Véase, Entrada Núm. 19 de SUMAC, Caso Núm. SJ2019CV08745.
[12] Esta orden fue notificada el 14 de diciembre de 2021. Véase, Entrada Núm. 20 de SUMAC, Caso Núm. SJ2019CV08745
[13] Esta sentencia fue notificada el 14 de diciembre de 2021. Véase, Entrada Núm. 21 de SUMAC, Caso Núm. SJ2019CV08745.
[14] Véase, Entrada Núm. 1 de SUMAC, págs. 1-3 de 3, Caso Núm. SJ2023CV06854.

*de Préstamo* para modificar la tasa de interés aplicable al 5.50% sobre el principal. Arguyó que los **Apelantes** incumplieron con el pago del referido Préstamo Comercial #101-2512785-8801, a pesar de las gestiones de cobro realizadas. De manera que estos le adeudaban solidariamente la suma **$50,000.00** por concepto de principal, más la suma de **$29,614.92** por concepto de intereses acumulados al **6 de julio de 2023** y que continuaban acumulándose diariamente; ello, a pesar de las gestiones de cobro realizadas. Por lo cual, las sumas reclamadas por **BPPR** a la **SLG Darcoli-Serra** estaban vencidas, líquidas y exigibles. En fin, solicitó el pago de las cantidades mencionadas.[15]

Tras varios trámites procesales,[16] la **SLG Darcoli-Serra** presentó su *Contestación a Demanda* el **22 de noviembre de 2023**.[17] En esencia, adujo que la deuda en controversia era una mercantil que se obtuvo como capital de trabajo de la empresa **Don Minzoni** dedicada al comercio y para operar con fines comerciales. Sostuvo que la **SLG Darcoli-Serra** no le adeudaba personalmente al **BPPR** y que los intereses reclamados estaban prescritos por tratarse un préstamo comercial. Además, los **Apelantes** presentaron entre

---

[15] Con la *Demanda* acompañó los siguientes anejos: **(1)** Anejo al Contrato-Flexicuenta de Negocio del 7/abril/2005; **(2)** Garantía Ilimitada y Continua del 7/abril/2005; **(3)** Enmienda al Pagaré de la Línea de Crédito Flexilínea o al Contrato de Préstamo del 7/abril/2011; **(4)** Carta de Cobro de Préstamo #101-2512785-8801, del Bufete Rivera-Munich & Hernández, con fecha de 11 de enero de 2023. Véase, Entrada Núm. 1 de SUMAC, Caso Núm. SJ2023CV06854.

[16] Cabe destacar que, el 16 de octubre de 2023, la **señora Serra Collazo** presentó una *Moción de Desestimación*, en la cual, en síntesis, alegó que el préstamo comercial reclamado estaba prescrito, dado que, bajo el Código de Comercio se tiene un plazo de tres (3) años para su reclamo, lo cual no ocurrió, ya que la carta de cobro del **BPPR** estaba fechada al 12 de enero de 2023. Véase, Entrada Núm. 12 de SUMAC, Caso Núm. SJ2023CV06854.

El 30 de octubre de 2023, el **BPPR** se opuso y, en apretado resumen, arguyó que la moción de la **señora Serra Collazo** estaba desprovista de prueba de que se tratara de un préstamo comercial. Véase, Entrada Núm. 14 de SUMAC, Caso Núm. SJ2023CV06854.

El 1 de noviembre de 2023, el **TPI** declaró NO HA LUGAR a la desestimación solicitada, dado que en esa etapa del proceso no contaba con prueba para sostener la reclamación de prescripción. No obstante, sí la consideró, para efectos procesales, como una defensa afirmativa oportunamente levantada y que, en su día, debía probarse. Fue notificada el 2 de noviembre de 2023. Véase, Entrada Núm. 19 de SUMAC, Caso Núm. SJ2023CV06854.

[17] Véase, Apéndice II de la *Apelación*, págs. 11-12. Véase, además, Entrada Núm. 22 de SUMAC, Caso Núm. SJ2023CV06854.

sus defensas afirmativas la prescripción de la deuda, mala fe, manos sucias, dolo contractual, entre otros.

Luego de varios trámites, inmeritorios pormenorizar, el **16 de agosto de 2024** las partes de presentaron el *Informe sobre Conferencia con Antelación al Juicio*.[18]

En cuanto a las enmiendas a las alegaciones, **SLG Darcoli-Serra** incluyó ciertas defensas afirmativas; en síntesis, que la propiedad perteneciente a **Don Minzoni** se vendió a un tercero para pagar las deudas de dicha corporación con la aprobación, participación y concurso del **BPPR** utilizando los corredores de la propia institución bancaria. Con ese propósito adujo que la **SLG Darcoli-Serra** se sometió a un proceso de mitigación de pérdidas y que a través de dicho proceso, el **BPPR** recibió el producto de la venta del inmueble. Incluso, recibió el producto de la venta del hogar familiar de los **Apelantes**, también vendido en el proceso de mitigación de pérdidas. Por lo que la deuda con el **BPPR** se satisfizo con la venta de sus bienes inmuebles. Así, arguyó que el **Apelado** actuó de mala fe al liquidar todos sus bienes, sin mencionar que todavía existía una parte de la deuda que pudo haberse liquidado mediante el proceso de mitigación de pérdidas.[19]

Sobre las teorías de las partes: el **BPPR** sostuvo, en síntesis, ser acreedor de una **deuda monetaria de naturaleza comercial** que consistía en una **línea de crédito** concedida a la extinta corporación **Don Minzoni** para propósitos de **capital de trabajo**, denominada como **FlexiLínea** y garantizada solidariamente por los **Apelantes**. Adujo que estos dejaron de pagar la **FlexiLínea** desde el 5 de septiembre de 2017; por lo que, el **11 de enero de 2018 el BPPR contabilizó el balance insoluto como un préstamo a término**

---

[18] Véase, Apéndice III de la *Apelación*, págs. 13-20. Véase, además, Entrada Núm. 40 de SUMAC, Caso Núm. SJ2023CV06854.
[19] Entrada Núm. 40 de SUMAC, págs. 1-2 de 8, Caso Núm. SJ2023CV06854.

—Préstamo #101-2512785-8801—, siendo la deuda acumulada al 6 de julio de 2023, de **$50,000.00** de balance principal, más **$29,614.42** de intereses acumulados; siendo estas, una suma vencida, liquida y exigible. En resumen, sustentó sus reclamos en las disposiciones contractuales y de fianza bajo el derogado **Código Civil de 1930** y su jurisprudencia interpretativa; y además, enfatizó ciertas disposiciones de actos comerciales del **Código de Comercio de Puerto Rico de 1932** y su jurisprudencia para negar su aplicación en este caso.[20]

Por su parte, la **SLG Darcoli-Serra** sostuvo como teoría del caso que, en resumen, la reclamación consistía en una deuda mercantil que estaba prescrita, toda vez que, la carta de reclamo del 11 de enero de 2023, como la demanda epígrafe, no se presentaron dentro del término prescriptivo de tres (3) años dispuesto en el **Código de Comercio de Puerto Rico de 1932**. De otra parte, adujo que el **BPPR** estaba impedido de cobrar dicha acreencia por haber actuado de mala fe al excluir el reclamo de epígrafe del proceso de mitigación de pérdidas. Arguyó que el **BPPR** renunció al cobro de la deuda debido a sus actuaciones dolosas al deliberadamente dejar fuera del proceso de mitigación de pérdidas las cantidades reclamadas. De igual forma, arguyó que las actuaciones del **Apelado** viciaron el consentimiento de los **Apelantes** al liquidar sus bienes para satisfacer las acreencias del **BPPR**, sin saber que aún estaban sujetos a deudas adicionales.[21]

En cuanto a la existencia de controversias, el **BPPR** aseveró que no existían controversias. Mientras que la **SLG Darcoli-Serra** señaló que existían controversias: **(1)** si la deuda reclamada estaba prescrita; **(2)** si la reclamación estaba sujeta a las defensas afirmativas levantadas; **(3)** la cuantía de la deuda reclamada; **(4)** la

---

[20] Entrada Núm. 40 de SUMAC, págs. 2-3 de 8, Caso Núm. SJ2023CV06854.
[21] Entrada Núm. 40 de SUMAC, págs. 3 de 8, Caso Núm. SJ2023CV06854.

cuantía de los intereses reclamados y cuánto de esos intereses estaban prescritos por el paso del tiempo.[22]

En lo que respecta a los hechos, ambas partes estipularon los siguientes hechos:

1. El 7 de abril de 2005 se firmó **Certificado de Resolución**.
2. El 7 de abril de 2005 se firmó **Carta, sobre aprobación de crédito comercial**. (Énfasis nuestro).
3. El 7 de abril de 2005 se firmó **Anejo al Contrato – FlexiCuenta de Negocios**. (Énfasis nuestro).
4. El 7 de abril de 2005 se firmó **Garantía Ilimitada y Continua**.
5. El 20 de abril de 2011 se firmó **Enmienda al Pagaré de la Línea de Crédito FlexiLínea o al Contrato de Préstamo**.
6. La parte demandada se acogió al procedimiento de *loss mitigation* promovido por el Banco Popular.
7. Mediante el procedimiento de *loss mitigation* los demandados liquidaron tanto la **propiedad comercial donde ubicaba su restaurant en Puerto Nuevo**, como su **residencia personal ubicada en Dorado, PR**.[23]

En cuanto a la prueba documental, las partes estipularon lo siguiente:

1. **Certificado de Resolución** (7 de abril de 2005).
2. **Carta** (7 de abril de 2005).
3. **Anejo al Contrato – FlexiCuenta de Negocios** (7 de abril de 2005).
4. **Garantía Ilimitada y Continua** (7 de abril de 2005).
5. **Enmienda al Pagaré de la Línea de Crédito FlexiLínea o al Contrato de Préstamo** (7 de abril de 2005).[24]

De otro lado, las partes no estipularon los siguientes documentos:

1. **Carta de Cobro** (11 de enero de 2023).
2. **Historial de Pago** del Préstamo #101-2512785-8801.
3. **Balance de Cancelación** -al día del juicio- para el Préstamo #101-2512785-8801.[25]

---

[22] *Ídem.*

[23] *Íd.* Énfasis nuestro.

[24] Entrada Núm. 40 de SUMAC, pág. 4 de 8, Caso Núm. SJ2023CV06854. Énfasis nuestro.

Cabe señalar que la fecha correcta de la Enmienda al Pagaré de la Línea de Crédito FlexiLínea o al Contrato de Préstamo es el 20 de abril de 2011. Véase, *Minuta de Vista de Conferencia con Antelación al Juicio*, del 28 de agosto de 2024, notificada 20 de septiembre de 2024. Entrada Núm. 48 de SUMAC, pág. 1 de 2, Caso Núm. SJ2023CV06854.

[25] Entrada Núm. 40 de SUMAC, pág. 4 de 8, Caso Núm. SJ2023CV06854. Énfasis nuestro.

Finalmente, en cuanto a la prueba testifical, el **BPPR** anunció al señor Rafael M. De Sevilla Rodríguez, Oficial de Cuentas del **BPPR**.[26] Por su parte, el **señor Darcoli Parrella** y la **señora Serra Collazo** serían los testigos de la parte **Apelante**.[27]

Luego de culminado el descubrimiento de pruebas, el **18 de diciembre de 2024**, el **BPPR** presentó una *Moción de Sentencia Sumaria*.[28] En síntesis, arguyó que los únicos asuntos litigiosos o en controversia eran: **(1)** si los **Apelantes** pagaron la deuda monetaria reclamada; y **(2)** si la deuda monetaria está prescrita y/o se renunció al cobro de esta. De otro lado, el **BPPR** alegó que los siguientes **hechos no estaban en controversia**:

1. El 7 de abril de 2005, la demandante le concedió a la extinta corporación Don Minzoni Inc., una línea de crédito por $50,000.00 en la modalidad de reserva a su cuenta corriente #027- 232867, la cual devengaría intereses a razón de 4% sobre el "Prime Rate" ("la FlexiLínea").[29]

2. La FlexiLínea estaría garantizada solidariamente por los demandados.[30]

3. El 7 de abril de 2005, los demandados suscribieron una Garantía Ilimitada y Continua a favor de la demandante.[31]

4. El 20 de abril de 2011, la demandante le concedió a la extinta corporación Don Minzoni Inc., y a los demandados la reestructuración de la FlexiLínea por el mismo margen crediticio

---

[26] En el *Informe para el Manejo del Caso*, el **BPPR** informó que el señor Rafael M. De Sevilla Rodríguez testificará sobre la relación contractual y el balance de la deuda existente. Véase, Anejo 1 de la *Moción Anejando Documento* del BPPR, Entrada Núm. 24 de SUMAC, pág. 2 de 3, Caso Núm. SJ2023CV06854.

[27] Entrada Núm. 40 de SUMAC, pág. 4 de 8, Caso Núm. SJ2023CV06854.

[28] Véase, Apéndice IV de la *Apelación*, págs. 21-49. Acompañó los siguientes anejos: **(1)** Certificado de Resolución Corporativa de Don Minzoni Inc., del 7/abril/2005; **(2)** Anejo al Contrato-Flexicuenta de Negocio del 7/abril/2005; **(3)** Carta de Aprobación de Crédito Comercial del 6/abril/2005; **(4)** Garantía Ilimitada y Continua del 7/abril/2005; **(5)** Enmienda al Pagaré de la Línea de Crédito Flexilínea o al Contrato de Préstamo del 20/abril/2011; **(6)** Declaración Jurada de Rafael M. De Sevilla Rodríguez, Oficial Autorizado del BPPR, fechada el 17 de diciembre/2024; **(7)** Historial de Pagos al Préstamo Comercial #101-2512785-8801 desde el 12/enero/2018 al 4/septiembre/2024; **(8)** Carta en aviso de atraso y/o vencimiento de pagos al Préstamo Comercial #101-2512785-8801, firmada por el Sr. Rafael M. De Sevilla, Comercial Credit Officer - Commercial Collections & W/O Support del BPPR, fechada el 9/febrero/2021; **(9)** Carta de Cobro de Préstamo #101-2512785-8801, del Bufete Rivera-Munich & Hernández, con fecha de 11 de enero de 2023. Véase, además, Entrada Núm. 55 de SUMAC, págs, 1-11 de 11, Caso Núm. SJ2023CV06854.

[29] Véase, Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854, los anejos: Certificado de Resolución Corporativa de Don Minzoni Inc., del 7/abril/2005; Anejo al Contrato-Flexicuenta de Negocio del 7/abril/2005; y, Carta de Aprobación de Crédito Comercial del 6/abril/2005.

[30] Véase, Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854, Carta de Aprobación de Crédito Comercial del 6/abril/2005.

[31] Véase, Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854, Garantía Ilimitada y Continua del 7/abril/2005.

($50,000.00), de manera que continuaría devengando intereses a razón de 5.50% sobre el "Prime Rate" ("la tasa de interés aplicable"). [32]

5. El 12 de enero de 2018, por falta de pago, la demandante canceló la FlexiLínea y convirtió el entonces balance insoluto de esta en el Préstamo #101-2512785-8801 ("el Préstamo #101-2512785-8801") que se reclama a los demandados en el caso de epígrafe.[33]

6. El 30 de abril de 2018, se formalizó una primera transacción a través de la unidad de mitigación de pérdidas ("loss mitigation") de la demandante, en virtud de la cual los demandados liquidaron los préstamos números 0702824547 (hipotecario) y 4549549013833971 (redi-equity).[34]

7. El 9 de febrero de 2021, la demandante reclamó extrajudicialmente a los demandados el pago del Préstamo #101-2512785-8801.[35]

8. El 26 de noviembre de 2021, se formalizó una segunda transacción a través de la unidad de mitigación de pérdidas ("loss mitigation") de la demandante, en virtud del cual los demandados liquidaron el préstamo número 0702813858 (hipotecario).[36]

9. El 11 de enero de 2023, la demandante reclamó extrajudicialmente a los demandados el pago del Préstamo #101-2512785-8801.[37]

10. Los demandados no han realizado pago alguno a la demandante por razón del Préstamo #101-2512785-8801.[38]

11. Los demandados han dejado de pagar el Préstamo #101-2512785-8801 y, en su consecuencia, han incurrido en incumplimiento de dicha obligación contractual para con la demandante, adeudándose solidariamente por los demandados a la demandante al 13 de diciembre de 2024 la cantidad principal de $50,000.00, más la cantidad de $39,625.19 por concepto de intereses acumulados a dicha fecha y los cuales

---

[32] Véase, Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854, Enmienda al Pagaré de la Línea de Crédito Flexilínea o al Contrato de Préstamo del 20/abril/2011.

[33] Véase, Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854, Declaración Jurada de Rafael M. De Sevilla Rodríguez, Oficial Autorizado del BPPR, fechada el 17 de diciembre/2024, párr. 3 y 4; y, Historial de Pagos al Préstamo Comercial #101-2512785-8801 desde el 12/enero/2018 al 4/septiembre/2024.

[34] Véase, Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854, Declaración Jurada de Rafael M. De Sevilla Rodríguez, Oficial Autorizado del BPPR, fechada el 17 de diciembre/2024, párr. 3 y 4.

[35] Véase, Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854, Declaración Jurada de Rafael M. De Sevilla Rodríguez, Oficial Autorizado del BPPR, fechada el 17 de diciembre/2024, párr. 3 y 7; y, Carta en aviso de atraso y/o vencimiento de pagos al Préstamo Comercial #101-2512785-8801, firmada por el Sr. Rafael M. De Sevilla, Comercial Credit Officer - Commercial Collections & W/O Support del BPPR, fechada el 9/febrero/2021.

[36] Véase, Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854, Declaración Jurada de Rafael M. De Sevilla Rodríguez, Oficial Autorizado del BPPR, fechada el 17 de diciembre/2024, párr. 3 y 4.

[37] Véase, Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854, Declaración Jurada de Rafael M. De Sevilla Rodríguez, Oficial Autorizado del BPPR, fechada el 17 de diciembre/2024, párr. 3 y 7; y, Carta de Cobro de Préstamo #101-2512785-8801, del Bufete Rivera-Munich & Hernández, con fecha de 11 de enero de 2023.

[38] Véase, Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854, Declaración Jurada de Rafael M. De Sevilla Rodríguez, Oficial Autorizado del BPPR, fechada el 17 de diciembre/2024, párr. 3 y 4; e, Historial de Pagos al Préstamo Comercial #101-2512785-8801 desde el 12/enero/2018 al 4/septiembre/2024.

continúan acumulándose diariamente, más una cantidad razonable por concepto de costas, gastos y honorarios de abogado, más los cargos, recargos y gastos que se acumulen hasta la fecha de su total y completo pago.[39]

12. La demandante ha realizado gestiones de cobro a los demandados, resultando estas infructuosas.[40]

13. Las sumas reclamadas por la demandante a los demandados están vencidas, son líquidas y exigibles.[41]

El **BPPR** arguyó que el **Código de Comercio de Puerto Rico de 1932** no era de aplicación al caso de epígrafe, ya que los **Apelantes** no demostraron que la **FlexiLínea** se utilizó para actos de comercio, según definido en el referido código. En específico, adujo que no se cumplió con el propósito dual que requiere el **Código de Comercio de Puerto Rico de 1932** de comprar un bien para revenderlo y obtener un lucro. Por lo tanto, aseveró que le no aplicaba el término de prescripción de tres (3) años del **Código de Comercio**. Razón por la cual, el TPI se encontraba ante un acto civil cuyo término prescriptivo era de quince (15) años, según dispuesto por el **Código Civil de 1930**.

El **17 de enero de 2025**, la **SLG Darcoli-Serra** presentó la *Oposición a la Moción de Sentencia Sumaria de la Parte Demandante y Solicitud de Sentencia Sumaria*.[42] En esencia, ratificó sus argumentos y defensas afirmativas sobre prescripción de la deuda por ser mercantil, mala fe e incuria. De otro lado, adujo que entre

---

[39] Véase, Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854, Declaración Jurada de Rafael M. De Sevilla Rodríguez, Oficial Autorizado del BPPR, fechada el 17 de diciembre/2024, párr. 3 y 4.

[40] Véase, Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854, Declaración Jurada de Rafael M. De Sevilla Rodríguez, Oficial Autorizado del BPPR, fechada el 17 de diciembre/2024, párr. 3 y 7.

[41] Véase, Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854, Declaración Jurada de Rafael M. De Sevilla Rodríguez, Oficial Autorizado del BPPR, fechada el 17 de diciembre/2024, párr. 3 y 6.

[42] Véanse, Apéndice V de la *Apelación*, págs. 50-74; o, Entrada Núm. 59 de SUMAC, págs. 1-17 de 17, Caso Núm. SJ2023CV06854. Se acompañó la moción con los siguientes anejos: **(1)** Declaración Jurada de los Apelantes del 17/enero/2025; **(2)** Contestación a Tercer Interrogatorio, juramentada por Rafael M. De Sevilla Rodríguez, Oficial del BPPR, fechada el 16/octubre/2024; **(3)** Carta de Aprobación de Crédito Comercial del 6/abril/2005; **(4)** Carta del BPPR sobre balance de cancelación al 18/nov./2024 del Préstamo Comercial #101-2512785-8801, firmada por Rafael M. De Sevilla, Oficial de Relación Comercial - Commercial Collections & W/O Support, Departamento de Préstamos Especiales del BPPR, fechada el 4/sept./2024; **(5)** Solicitud de Crédito Comercial (Comercial Credit Aplication) al BPPR de los Apelantes del 5/abril/2005.

las partes hubo un contrato de transacción en el que la obligación reclamada quedó extinta mediante la entrega y venta de las propiedades perteneciente a la **SLG Darcoli-Serra**. De igual forma, señaló que mediante contestación a interrogatorio, el **BPPR** afirmó que en los dos (2) procesos de mitigación de pérdidas no se consideró ni se incluyó la **FlexiLínea**. En ese sentido, sostuvo que la **FlexiLínea** era la única obligación que tenía con el **BPPR** al momento de acogerse al proceso de mitigación de pérdidas. Además, indicó que dicha deuda estaba garantizada por una segunda hipoteca que gravaba el hogar familiar de los **Apelantes** y que fue vendido en un *short sale.*

De otra parte, la **SLG Darcoli-Serra** adujo que los siguientes **hechos estaban en controversia:**

> a. Si el Banco Popular incurrió en violación de los principios de que requieren la buena fe en los negociaciones y transacciones según, el dogma aplicable en Puerto Rico sobre la buena y que fue reiterado por el nuevo código civil.
>
> b. Si mediante el acuerdo efectuado entre los demandados y el Banco Popular para entregar y vender sus dos propiedades inmuebles para el saldo de sus obligaciones constituye **un contrato de transacción** y finiquito que impide nuevamente el cobro de la misma línea de crédito comercial que se saldó mediante el proceso de loss mitigation. (Énfasis en original).
>
> c. A cuánto asciende la suma adeudada.
>
> d. Si la deuda reclamada, al ser una deuda mercantil, está prescrita.
>
> e. Si la parte demandante incurrió en incuria.
>
> f. Si los intereses reclamados están prescritos o son usurarios al pretender cobrar el 14% de interés.[43]

De otro modo, la **SLG Darcoli-Serra** indicó que los siguientes **hechos materiales no estaban en controversia**:

> a. La Parte demandante Banco Popular de Puerto Rico allá para el año 2005 pactó con la Corporación denominada Don Minzoni, Inc., extenderle una línea de crédito comercial por la suma principal de hasta cincuenta mil dólares. Se especificó en los documentos de solicitud, que el propósito de la línea de crédito era para capital de trabajo del Restaurant de nombre *Pinoli,* que operaba la referida corporación.
>
> b. La corporación tenía una cuenta comercial con el Banco Popular denominada Flexi-cuenta Comercial.

---

[43] Entrada Núm. 59 de SUMAC, pág, 4 de 17, Caso Núm. SJ2023CV06854.

c. La línea de crédito comercial funcionaba a manera de una reserva de fondos de la cuenta de cheques del negocio; de manera que si Don Minzoni giraba y pagaba sus suplidores y en si en ese momento no tenía fondos suficientes de los ingresos que percibía de sus operaciones diarias para cubrir el cheque girado, entonces se adelantaban los fondos de la referida línea de crédito, para cubrir la orden de pago.

d. El Banco Popular a su vez, debitaba automáticamente de la misma cuenta, los pagos o abonos para acreditar a la cuenta de reserva, y reducir la deuda de la reserva.

e. En garantía de la obligación mercantil contraída por la corporación, el Banco Popular le exigió a los accionistas de la misma – los aquí demandados Christian Darcoli Parrella y María Serra Collazo - que otorgaran una garantía personal donde se obligaban a responder personalmente en caso de incumplimiento, con referido préstamo comercial contraído por la corporación.

f. En adición a la garantía personal y como colateral adicional del referido préstamo comercial de la línea de crédito, se constituyó una segunda hipoteca sobre la residencia personal de los señores Darcoli-Serra.

g. Además, el Banco Popular tenía una primera hipoteca sobre el edificio donde ubicaba el restaurante *Pinoli* en la avenida de Diego en Puerto Nuevo.

h. Tras el desastre causado en Puerto Rico por los huracanes Irma y María, las operaciones del restaurante vinieron a mal por causas ajenas a los garantizadores.

i. A pesar de que por tantos años las partes operaron de la forma que se describe en los párrafos c y d anteriores, el Banco dispuso el cierre de la cuenta corriente y exigió el pago del balance de la de la obligación mercantil; o sea el balance que existía en ese momento de la línea de crédito.

j. Tras las gestiones de cobro de Banco Popular, los aquí demandados acudieron a la División de Loss Mitigation del Banco Popular a solicitar ayuda para saldar la referida deuda mercantil.

k. En esa División, le recomendaron que liquidaran sus bienes inmuebles, ya que no tenían otra fuente de repago.

l. Les indicaron que el Banco designaría unos corredores de bienes raíces, para vender su propiedad. Del producto de esa venta , se pagarían y liquidarían las deudas comerciales de Don Minzoni, Inc., y las de los aquí demandados. Ese fue el pacto.

m. No teniendo otra alternativa para pagar, los señores demandados, en acuerdo con el Banco Popular, accedieron a entregar al Banco sus bienes: tanto su residencia en Dorado, como su negocio. Esto, para pagar sus obligaciones para y con el Banco, especialmente la línea de crédito comercial que garantizaron.

n. El Banco Popular requirió que los deudores contrataran corredores de bienes raíces aceptables al Banco con el encargo de vender y liquidar lo más pronto posible los dos bienes inmuebles de los demandados en "short sale". Entonces, por la

prisa del Banco, los bienes se vendieron que [sic] vender [sic] por debajo de su verdadero valor.

o. Todo el producto de los referidos short sales, excepto los gastos de cierre y las comisiones, los recibió el Banco Popular.

p. El total del dinero recaudado de esas ventas, se utilizó para el pago de todas las deudas de los demandados con el Banco Popular, incluyendo y en especial, a línea de crédito comercial por $50,000.00.

q. El Banco Popular recibió directamente todo el producto de las ventas, menos los gastos de cierre y comisiones.

r. Aunque se quedaron sin bienes y no recibieron un centavo, por lo menos pudieron finiquitar sus obligaciones con Banco Popular. Tras perderlo todo en esas transacciones, al menos se según su mejor entender y saber, quedaron liberados de sus obligaciones.

s. No obstante, varios años después, recibieron la presente demanda cobrando los mismos $50,000.00 de la línea de crédito. La misma obligación que habían garantizado y pagado mediante el procedimiento de *loss mitigation*, varios años antes.

t. En una reciente contestación a interrogatorio que le remitimos al Banco Popular, fechada 16 de octubre de 2024,[44] la parte demandante contestó bajo juramento en la página dos párrafo de la contestación que contrario a lo que les representaron años antes a los demandados en la División de *Loss Mitigation*, la línea de crédito denominada Flexilínea no fue considerada ni incluida en el procedimiento de *loss mitigation*.

u. No obstante, esa era la única obligación que le habían garantizado personalmente los demandados al Banco Popular. Además de la garantía personal, constituyeron una hipoteca sobre su casa, por lo que necesariamente se tenía que haber cancelado mediante el contrato de transacción que se configuró entre las partes mediante el proceso de *loss mitigation*.

v. Los demandados siempre entendieron que la línea de crédito comercial y la hipoteca que gravaba el edificio del restaurante, eran las deudas que se estaban transigiendo mediante el proceso de *loss mitigation*. Para eso fue tuvieron que vender su casa y su negocio en un short sale para pagarle las deudas antes relacionada al Banco Popular.

w. El Banco Popular en ningún momento les advirtió a los demandados que aún podrían cobrarle la misma acreencia deuda personal, por la garantía personal que estos emitieron en relación con la línea de crédito concedida a Don Minzoni, Inc. De haberse advertido este hecho, jamás hubieran accedido a realizar el short sale de sus propiedades.

x. Fundado en esos antecedentes los demandado afirman bajo juramento que no le adeudan un centavo a la parte demandante.[45]

---

[44] Véase, Entrada Núm. 59 de SUMAC, Caso Núm. SJ2023CV06854, Contestación a Tercer Interrogatorio, juramentada por Rafael M. De Sevilla Rodríguez, Oficial del BPPR, fechada el 16/octubre/2024.

[45] Véase, Entrada Núm. 59 de SUMAC, págs. 4-7 de 17, Caso Núm. SJ2023CV06854. A esos fines, los **Apelantes** suscribieron y anejaron con este escrito una declaración jurada de fecha 17 de enero de 2025.

Finalmente, los **Apelantes** reiteraron que la **FlexiLínea** era una línea de crédito comercial, conforme las disposiciones del **Código de Comercio de Puerto Rico de 1932**. Por lo cual subrayaron que, conforme al mencionado código, un préstamo se considera mercantil cuando una de las partes es comerciante y cuando la cosa prestada se destina a actos de comercio. Por ello, argumentaron que al ser un acto comercial, el término prescriptivo era de tres (3) años y que en base a ello, la causa de acción presentada por el **BPPR** estaba prescrita.

El **5 de febrero de 2025**, el **BPPR** presentó una *Moción en Cumplimiento de Orden Réplica a "Oposición a la Moción de Sentencia Sumaria* [...]".[46] En síntesis, adujo que en las determinaciones de hechos incontrovertidas (a-x) presentadas por la **SLG Darcoli-Serra**,[47] coinciden con las determinaciones núm. 1, 2, 3, 4, 5 y 10 consignadas por el BPPR;[48] a saber:

1. El 7 de abril de 2005, la demandante le concedió a la extinta corporación Don Minzoni Inc., una línea de crédito por $50,000.00 en la modalidad de reserva a su cuenta corriente #027- 232867, la cual devengaría intereses a razón de 4% sobre el "Prime Rate" ("la FlexiLínea").[49]

2. La FlexiLínea estaría garantizada solidariamente por los demandados.[50]

3. El 7 de abril de 2005, los demandados suscribieron una Garantía Ilimitada y Continua a favor de la demandante.[51]

4. El 20 de abril de 2011, la demandante le concedió a la extinta corporación Don Minzoni Inc., y a los demandados la

---

[46] Véase, Entrada Núm. 61 de SUMAC, Caso Núm. SJ2023CV06854. Acompañó los siguientes documentos: **Anejo (1)** Payoff Statement BPPR-Mortgage Servicing, Núm. Préstamo **702824574**, PAYOFF STATEMENT GOOD THROUGH **5/1/2018**, **SHORT SALE**, fechado 30/abril/2018; **Anejo (2)** BPPR-Servicio al Consumidor, **ACUERDO** de pago del Préstamo núm. **4549549013833971**, correspondiente a la cuenta **Redi Equity**, fechado 30/abril/2018; y, **Anejo (3)** Payoff Statement BPPR-Mortgage Servicing, Núm. Préstamo **702813858**, PAYOFF STATEMENT GOOD THROUGH **11/30/2021**, **SHORT SALE**, firmada 23/nov./2021.
[47] Véase, Oposición a la Moción de Sentencia Sumaria de la Parte Demandante y Solicitud de Sentencia Sumaria, Entrada Núm. 59 de SUMAC, págs., 4-7 de 17, Caso Núm. SJ2023CV06854.
[48] Véase, Entrada Núm. 61 de SUMAC, págs. 1-2 de 5, Caso Núm. SJ2023CV06854.
[49] Véase, Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854, los anejos: Certificado de Resolución Corporativa de Don Minzoni Inc., del 7/abril/2005; Anejo al Contrato-Flexicuenta de Negocio del 7/abril/2005; y, Carta de Aprobación de Crédito Comercial del 6/abril/2005.
[50] Véase, Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854, Carta de Aprobación de Crédito Comercial del 6/abril/2005.
[51] Véase, Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854, Garantía Ilimitada y Continua del 7/abril/2005.

reestructuración de la FlexiLínea por el mismo margen crediticio ($50,000.00), de manera que continuaría devengando intereses a razón de 5.50% sobre el "Prime Rate" ("la tasa de interés aplicable"). [52]

5. El 12 de enero de 2018, por falta de pago, la demandante canceló la FlexiLínea y convirtió el entonces balance insoluto de esta en el Préstamo #101-2512785-8801 ("el Préstamo #101-2512785-8801") que se reclama a los demandados en el caso de epígrafe.[53]

[...]

10. Los demandados no han realizado pago alguno a la demandante por razón del Préstamo #101-2512785-8801.[54]

En cuanto al proceso de **mitigación de pérdidas** del año 2018, el **BPPR** adujo que se le produjo evidencia a la **SLG Darcoli-Serra** de que las deudas "liquidadas" correspondían a los préstamos números 0702824547 (hipotecario) y 4549549013833971 (redi-equity). Por lo cual, la **FlexiLínea** convertida al Préstamo Comercial #101-2512785-8801 en el 2018, y no pagada, contradecía la teoría del contrato de transacción.[55]

En cuanto al proceso de mitigación de pérdidas del año 2021, el **BPPR** alegó que se le produjo evidencia a la **SLG Darcoli-Serra** de, que la deuda "liquidada" correspondía al préstamo número 0702813858 (hipotecario), y no a la **FlexiLínea** comercial convertida al Préstamo Comercial #101-2512785-8801 ante la falta de pago en el 2018. Por lo cual, esto también contradecía la teoría del contrato de transacción.[56]

---

[52] Véase, Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854, Enmienda al Pagaré de la Línea de Crédito Flexilínea o al Contrato de Préstamo del 20/abril/2011.

[53] Véanse, Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854, Declaración Jurada de Rafael M. De Sevilla Rodríguez, Oficial Autorizado del BPPR, fechada el 17 de diciembre/2024, párr. 3 y 4; e, Historial de Pagos al Préstamo Comercial #101-2512785-8801 desde el 12/enero/2018 al 4/septiembre/2024.

[54] Véanse, Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854, Declaración Jurada de Rafael M. De Sevilla Rodríguez, Oficial Autorizado del BPPR, fechada el 17 de diciembre/2024, párr. 3 y 4; e, Historial de Pagos al Préstamo Comercial #101-2512785-8801 desde el 12/enero/2018 al 4/septiembre/2024.

[55] Véase, Entrada Núm. 61 de SUMAC, Caso Núm. SJ2023CV06854, Payoff Statement BPPR-Mortgage Servicing, Núm. Préstamo **702824574**, PAYOFF STATEMENT GOOD THROUGH **5/1/2018**, **SHORT SALE**, fechado 30/abril/2018; y, BPPR-Servicio al Consumidor, **ACUERDO** de pago del Préstamo núm. **4549549013833971**, correspondiente a la cuenta **Redi Equity**, fechado 30/abril/2018.

[56] Véase, Entrada Núm. 61 de SUMAC, Caso Núm. SJ2023CV06854, Payoff Statement BPPR-Mortgage Servicing, Núm. Préstamo **702813858**, PAYOFF

El **BPPR** señaló que, a base de los documentos que no fueron controvertidos por los **Apelantes**, no existe controversia sobre los hechos materiales núm. 6, 7, 8, 9, 11, 12 y 13 de su moción de sentencia sumaria.[57]

Por último, alegó que la **SLG Darcoli-Serra** falló en probar que la **FlexiLínea** —convertida al Préstamo #101-2512785-8801 en el 2018 por falta de pago— fue un "acto de comercio". Arguyó que en este caso la referencia a "comercial", era solo para distinguir esta deuda de la hipotecaria, sin efecto jurídico alguno.[58]

Tras evaluar los escritos de ambas partes, el **21 de febrero de 2025**, el **TPI** dictó la *Sentencia Sumaria*.[59] En ella, declaró *Con Lugar* la *Demanda* presentada por el **BPPR** y realizó las siguientes **determinaciones de hechos incontrovertidos**:

1. El 7 de abril de 2005, la entonces corporación de los demandados, Don Minzoni Inc., obtuvo de la demandante una línea de crédito por la suma principal de $50,000.00 e intereses a razón de 4% sobre el "Prime Rate", en la modalidad de reserva para la cuenta corriente #027-232867, denominada como FlexiLínea ("la FlexiLínea").

2. En esa misma fecha (7 de abril de 2005), los demandados suscribieron una Garantía Ilimitada y Continua a favor de la demandante en relación con la FlexiLínea.

3. El 20 de abril de 2011, la demandante les concedió a Don Minzoni Inc., y a los demandados la reestructuración de la FlexiLínea, para que continuase devengando intereses a razón de 5.50% sobre el "Prime Rate".

4. Don Minzoni Inc., y los demandados incumplieron con el pago de la FlexiLínea.

5. La demandante canceló la FlexiLínea.

6. El 12 de enero de 2018, la totalidad de lo debido por Don Minzoni Inc. y los demandados a la demandante en relación con la FlexiLínea quedó vencido, líquido y exigible como el Préstamo #101-2512785-8801 ("el Préstamo #101-2512785-8801").

7. El Préstamo #101-2512785-8801 corresponde a la FlexiLínea, por cuanto "2512785" es el número de cliente Don Minzoni Inc., con la demandante, lo que se puede apreciar claramente de la Enmienda al Pagaré de la Línea de Crédito FlexiLínea o al

---

STATEMENT GOOD THROUGH **11/30/2021**, SHORT SALE, firmada el 23/nov./2021.

[57] Véase, Entrada Núm. 61 de SUMAC, pág. 2 de 5, Caso Núm. SJ2023CV06854.

[58] Véase, Entrada Núm. 61 de SUMAC, págs. 3-4 de 5, Caso Núm. SJ2023CV06854.

[59] Notificada el 24 de febrero de 2025. Véase, Apéndice VI de la *Apelación*, págs. 75-82. Además, véase, Entrada Núm. 63 de SUMAC, págs. 1-8 de 8, Caso Núm. SJ2023CV06854.

Contrato de Préstamo suscrito por los demandados el 20 de abril de 2011.

8. El 30 de abril de 2018, la demandante formalizó con los demandados una primera transacción de liquidación de deudas a través de la unidad de mitigación de pérdidas ("loss mitigation"), para el Préstamo #0702824547 y el Préstamo #4549549013833971.

9. El Préstamo #101-2512785-8801 no fue liquidado el 30 de abril de 2018.

10. El 9 de febrero de 2021, la demandante le cursó a los demandados una carta de cobro en relación con el Préstamo #101-2512785-8801. Énfasis nuestro

11. El 26 de noviembre de 2021, la demandante formalizó con los demandados una segunda transacción de liquidación de deuda a través de la unidad de mitigación de pérdidas ("loss mitigation"), para el Préstamo #0702813858.

12. El Préstamo #101-2512785-8801 no fue liquidado el 26 de noviembre de 2021.

13. El 11 de enero de 2023, la demandante le cursó a los demandados otra carta de cobro en relación con el Préstamo #101-2512785-8801.

14. Los demandados no realizaron pago alguno a la demandante en relación con el Préstamo #101-2512785-8801.

15. Al 13 de diciembre de 2024, los demandados adeudaban a la demandante en relación con el Préstamo #101-2512785-8801 la cantidad de $50,000.00 por concepto de principal, más la cantidad de $39,625.19 por concepto de intereses acumulados a dicha fecha y los cuales continúan acumulándose diariamente a la tasa de interés pactada, más una cantidad razonable por concepto de gastos legales, más los cargos, recargos y gastos que se acumulen hasta la fecha de su total y completo pago.

16. Las sumas reclamadas por la demandante a los demandados en relación con el Préstamo #101-2512785-8801 están vencidas, son líquidas y exigibles.

17. La demandante ha realizado gestiones de cobro a los demandados en relación con el Préstamo #101-2512785-8801, resultando estas infructuosas.

18. Al presente los demandados no han pagado totalmente su deuda monetaria para con la demandante en relación con el Préstamo #101-2512785-8801.

19. Por el incumplimiento contractual de los demandados en relación con el Préstamo #101-2512785-8801, la demandante ha optado por proceder a su cobro por la vía judicial.

El **TPI** determinó que, a pesar de las alegaciones de la **SLG Darcoli-Serra** sobre la liquidación del Préstamo #101-2512785-8801, mediante un contrato de transacción, estos nunca presentaron prueba documental que sustentara dicha alegación. No obstante, encontró probado que el **BPPR** produjo prueba de que las

deudas liquidadas correspondían a otros préstamos. De otro lado, resolvió que los **Apelantes** no cumplieron con el propósito dual requerido por el **Código de Comercio de Puerto Rico de 1932** de comprar un bien para revenderlo y obtener un lucro. Por ello, concluyó que no se realizaron actos de comercio y por lo tanto, no aplicaba el **Código de Comercio de Puerto Rico de 1932**. Encontró que la **SLG Darcoli-Serra** no logró probar que la **FlexiLínea** fue un acto de comercio. Por ello, concluyó que se trataba de un acto civil al que le aplicaba el término prescriptivo de quince (15) años dispuesto en el **Código Civil de 1930**. Resolvió que, ciertamente, en los documentos provistos por el **BPPR** se hace referencia a la **FlexiLínea** como *línea de crédito comercial*; sin embargo, concluyó que la referencia *comercial* era solo para distinguir esa deuda de la deuda hipotecaria, sin efecto jurídico alguno. Por lo cual, condenó a los **Apelantes** a pagarle al **BPPR** la suma de **$50,000.00** por concepto de principal, más la cantidad de **$39,625.19** por concepto de intereses vencidos, al 13 de diciembre de 2024, y los cuales continúan acumulándose mensualmente, a razón de la tasa de interés pactada, más **$4,000.00** por concepto de honorarios de abogado.

El **11 de marzo de 2025**, la **SLG Darcoli-Serra** presentó una *Moción de Reconsideración*.[60] En apretada síntesis, sostuvo que el **BPPR** no presentó evidencia sobre qué cantidades se acreditaron al préstamo mercantil cuando se realizó el proceso de mitigación de pérdidas. Indicó que de la prueba que obra en el expediente no se puede determinar cuánto pago el deudor principal —**Don Minzoni**— de la obligación mercantil; máxime, cuando **Don Minzoni** se sometió al proceso de mitigación de pérdidas para liquidar la línea de crédito comercial. También, adujo que existía una monumental

---

[60] Véase, Apéndice VII de la *Apelación*, págs. 83-88; o, Entrada Núm. 64 de SUMAC, págs. 1-6 de 6, Caso Núm. SJ2023CV06854.

controversia de hecho sobre la procedencia del cobro de intereses, la prescripción del reclamo, la exactitud del cálculo y la cuantía de la deuda remanente. De otro lado, la **SLG Darcoli-Serra** reiteró que la **FlexiLínea** constituye un acto comercial porque se tomó para capital de trabajo de **Don Minzoni**, una corporación que se dedicaba al comercio mediante la operación de un restaurante —*Pinoli*—, convirtiendo a la persona jurídica de **Don Minzoni** en un comerciante. Reiteró que de la propia solicitud de crédito comercial anejada a su escrito en *Oposición a Sentencia Sumaria* surge que el propósito de dicha cuenta era "*WORKING CAPITAL – INVENTORY & ACCTS RECEIVABLES*".

El **26 de marzo de 2025**, el **BPPR** presentó su *Oposición a "Moción de Reconsideración"*.[61] En resumidas cuentas, se limitó a señalar que el escrito de la **SLG Darcoli-Serra** no cumplió con el estándar aplicable a las solicitudes de reconsideración. Por lo que, solicitó el rechazo de plano la reconsideración de los **Apelantes**. A su vez, señaló que la *Oposición a Sentencia Sumaria* no cumplió con los requisitos doctrinales. En fin, catalogó como correcta la determinación judicial que dispuso sumariamente del pleito.

El **31 de marzo de 2025**, el **TPI** declaró *Sin Lugar* la *Moción de Reconsideración* de los **Apelantes**.[62]

En desacuerdo, la **SLG Darcoli-Serra** presentó el recurso de apelación que nos ocupa, imputándole al **TPI** la comisión de los siguientes errores:

> **PRIMER ERROR**: Erró el Tribunal de Primera Instancia al no resolver que entre las partes existía un contrato de transacción tramitado a través del proceso de *loss mitigation* que tuvo el efecto finiquitar la deuda y de liberar a los garantizados de la obligación reclamada en la Demanda.

> **SEGUNDO ERROR**: Erró el Tribunal de Primera Instancia al no desestimar la demanda por estar prescrita la reclamación de una deuda mercantil.

---

[61] Véase, Apéndice VIII de la Apelación, págs. 89-91; o, Entrada Núm. 66 de SUMAC, págs. 1-3 de 3, Caso Núm. SJ2023CV06854.
[62] Véase, Apéndice IX de la *Apelación*, pág. 92; o, Entrada Núm. 67 de SUMAC, págs. 1 de 1, Caso Núm. SJ2023CV06854

**TERCER ERROR**: Erró el Tribunal de Primera Instancia al dictar sentencia sumaria habiendo serias controversias de hecho y de derecho en este litigio.

El **BPPR** compareció mediante el *Alegato en Oposición*. En resumidas cuentas, reiteró los argumentos esbozados ante el **TPI**; no obstante, señaló que la defensa de prescripción presentada por la **SLG Darcoli-Serra** se basaba en una alegación errónea. Esto es, —y por primera vez arguye en esta etapa apelativa—, que la **FlexiLínea** es un instrumento negociable sujeto a las disposiciones de la Ley Núm. 208 de 17 de agosto de 1995, según emendada conocida como la Ley de Transacciones Comerciales ("Ley de Transacciones Comerciales").[63] Adujo que los **Apelantes** descansan en que la **FlexiLínea** es un instrumento negociable al que le es aplicable el término prescriptivo de tres (3) años instituido en la **Ley de Transacciones Comerciales**. No obstante, arguyó que la **FlexiLínea** no tenía fecha de vencimiento cierta, ni tenía una fecha cierta u vigencia y efectividad cuando se suscribió. Tampoco, en la **FlexiLínea**, se hizo referencia a una cantidad fija que le hubiese sido desembolsada a los **Apelantes**; sino que, solo se hizo referencia al máximo aprobado en la línea de crédito. Además, arguyó que en la **FlexiLínea** se hizo referencia a documentos externos que fueron incorporados por referencia, lo cual derrota, que la misma sea un instrumento negociable. Finalmente, señaló que la **FlexiLínea** guarda más relación con un contrato de cuenta rotativa o tarjeta de crédito que, con un instrumento negociable.

-II-

-A-

El mecanismo de sentencia sumaria procura, ante todo, aligerar la tramitación de aquellos casos en los cuales no existe una controversia de hechos real y sustancial que exija la celebración de

---

[63] 19 LPRA sec. 401 *et seq.*

un juicio en su fondo.[64] Al respecto, es la Regla 36 de Procedimiento Civil la que regula el proceso mediante el cual cualquiera de las partes en un pleito puede solicitar al tribunal que dicte sentencia sumaria a su favor.[65] Así, cuando cualquier parte reclamante solicite que el pleito sea resuelto por la vía sumaria, deberá demostrar en su solicitud, *"la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación".*[66]

De modo que el criterio rector al momento de considerar la procedencia de un dictamen sumario es que no haya controversia sobre los hechos esenciales y pertinentes, según alegados por las partes en sus respectivas solicitudes y/u oposiciones, y que sólo reste aplicar el derecho.[67] Los jueces no están limitados por los hechos o documentos evidenciarlos que se aduzcan en la solicitud de sentencia sumaria. Deben considerar todos los documentos en autos, sean o no parte de la solicitud, de los cuales surjan *admisiones* hechas por las partes.[68] La fórmula, debe ser, por lo tanto, que la moción de sentencia sumaria adecuadamente presentada solo puede negarse si la parte que se opone a ella presenta una oposición basada en hechos que puedan mover a un juez a resolver a su favor.[69]

Si el juez se convence de que no existe una posibilidad razonable de que escuchar lo que lee no podrá conducirlo a una decisión a favor de esa parte, debe dictar sentencia sumaria.[70] Quiere decir que, en ausencia de una controversia de hechos

---

[64] *Rodríguez García v. UCA*, 200 DPR 929 (2018).
[65] Reglas de Procedimiento Civil de 2009, 32 LPRA Ap. V., R. 36.
[66] 32 LPRA Ap. V. R. 36.1 y 36.2.
[67] *Velázquez Ortiz v. Mun. de Humacao,* 197 DPR 656, 661 (2017).
[68] *Vera v. Dr. Bravo*, 161 DPR 308, 333 (2004).
[69] *Velázquez Ortiz v. Mun. de Humacao, supra.*
[70] *Íd.*

materiales discernible, corresponderá a los tribunales aplicar el derecho y resolver conforme al mismo.[71]

En cambio, el TPI no deberá dictar sentencia sumaria cuando: **(1)** existen hechos materiales controvertidos; **(2)** hay alegaciones afirmativas en la demanda que no han sido refutadas; **(3)** surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material; y **(4)** como cuestión de derecho no procede.[72]

Por otra parte, es menester señalar que al ejercer nuestra función revisora sobre decisiones en las que se aprueba o deniega una solicitud de sentencia sumaria, nos encontramos en la misma posición que los foros de primera instancia.[73] Siendo la revisión una de *novo*, debemos ceñirnos a los mismos criterios y reglas que nuestro ordenamiento les impone a estos, y debemos constatar que los escritos de las partes cumplan con los requisitos codificados en la Regla 36 de Procedimiento Civil, *supra*.[74]

A tenor con lo expuesto, el Tribunal Supremo de Puerto Rico, ha pautado lo siguiente:

> [E]l Tribunal de Apelaciones debe revisar si en realidad existen hechos materiales en controversia. De haberlos, el foro apelativo intermedio tiene que cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil y debe exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos. [...].
> [Por el contrario], de encontrar que los hechos materiales realmente están incontrovertidos, el foro apelativo intermedio procederá entonces a revisar de novo si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia.[75]

Desde luego, el alcance de nuestra función apelativa al intervenir en estos casos no comprenderá la consideración de

---

[71] *Rodríguez García v. UCA, supra.*
[72] *Fernández Martínez v. RAD-MAN San Juan III-D, LLC*, 208 DPR 310, 335 (2021).
[73] *Rivera Matos et al. v. Triple-S et al.,* 204 DPR 1010, 1025 (2020); *González Santiago v. Baxter Healthcare,* 202 DPR 281, 291 (2019).
[74] *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 118 (2015).
[75] *Íd.*, págs. 118-119.

prueba que no fue presentada ante el foro de primera instancia, ni la adjudicación de hechos materiales en controversia.[76]

**-B-**

El Código de Comercio de Puerto Rico de 1932 (en adelante, Código de Comercio) define como *comerciantes* a aquellos que "*teniendo capacidad legal para ejercer el comercio, se dedican a él habitualmente, en nombre propio*".[77] También son comerciantes "*las compañías, corporaciones y asociaciones mercantiles o industriales, que se constituyeren con arreglo a este Código o a leyes especiales, y las corporaciones y compañías que se hayan organizado en el extranjero, también para fines mercantiles e industriales y que estén debidamente autorizadas para hacer negocios en Puerto Rico*".[78]

En cuanto a qué constituye un *acto de comercio*, el Código de Comercio dispone expresamente lo siguiente:

> Los actos de comercio, sean o no comerciantes los que los ejecuten, y estén o no especificados en este Código, se regirán por las disposiciones contenidas en él; y en su defecto, por los usos del comercio observados generalmente en cada plaza, y a falta de ambas reglas, por las del derecho común.
> Serán reputados actos de comercio los comprendidos en este Código, y cualesquiera otros de naturaleza análoga.[79]

El Tribunal Supremo de Puerto Rico ha resuelto que poseer las características de comerciante, por sí solo no es determinante para invocar la protección del Código de Comercio.[80] De manera que, resulta necesario que el prestatario demuestre que la cosa prestada fue destinada a fines comerciales. Así pues, "*[q]uien invoque el Código de Comercio tiene la carga de la prueba sobre su aplicabilidad*".[81]

Por su parte, el Artículo 229 del Código de Comercio dispone que se reputará mercantil todo préstamo en el que concurran las

---

[76] *Íd.*
[77] Artículo 1 Código de Comercio. 10 LPRA sec. 1001.
[78] *Íd.*
[79] Artículo 2 Código de Comercio. 10 LPRA sec. 1002.
[80] *Sociedad de Gananciales v. Paniagua Diez,* 142 DPR 98, 107 (1996).
[81] *Pescadería Rosas, Inc. v. Lozada,* 116 DPR 474, 481(1985); *Reece Corp v. Ariela Inc.,* 122 DPR 270, 280 (1988).

siguientes circunstancias: **1)** si alguno de los contratantes fuera comerciante; y **2)** si las cosas prestadas se destinaren a actos de comercio.[82] Ahora bien, las condiciones que enumera dicho artículo deben interpretarse de forma copulativa. Por tanto, si se prescinde de alguna de ellas, el Código de Comercio no aplica.[83]

Nuestro máximo foro estatal ha determinado que para definir lo que constituye un acto de comercio se han desarrollado varias teorías: la **objetiva**, **subjetiva** y del **accesorio**.[84]

La teoría **subjetiva** cataloga un acto como mercantil tomando en consideración las personas que lo llevan a cabo.[85] La teoría **objetiva** se centra en la naturaleza de los actos para determinar si son mercantiles.[86] Por último, la teoría del **accesorio** considera inferir el carácter mercantil de un acto por su relación con otros de naturaleza comercial propia.[87] Esto es, aquellos que, de tomarse aisladamente se considerarían de naturaleza civil, se catalogan como mercantiles al ponerse en contacto con un acto de comercio propio. Aún establecidas estas teorías, la realidad es que resulta difícil enmarcar en alguna de ellas todas las posibles categorías de los actos de comercio.[88]

Al no existir en nuestra tradición jurídica un concepto unitario de lo que es un acto de comercio, cada situación merece un examen por separado. Los factores definitorios de la naturaleza, comercial o civil, de una transacción varían de caso en caso.[89] Se ha considerado que para determinar si el negocio en cuestión constituye un acto de comercio, es preciso examinar el acto en sí. No obstante, la extensión del concepto "acto de comercio" y lo que este significa también

---

[82] 10 LPRA sec. 1651.
[83] *Pescadería Rosas, Inc. v. Lozada, supra*, pág. 477.
[84] *Pacheco v. Nat'l Western Life Ins. Co.*, 122 DPR 55 (1941).
[85] *Íd.*, pág. 61.
[86] *Íd.*
[87] *Íd.*, pág. 62.
[88] *Íd.*
[89] *Pescadería Rosas, Inc. v. Lozada, supra*, pág. 479.

incluye las consecuencias jurídicas que se derivan del mismo.[90] Por tanto, cuando se incumple una obligación mercantil, el efecto jurídico creado por el incumplimiento se considera mercantil por ser accesorio a un acto de comercio principal.[91]

Entonces, es el propio Código de Comercio que en su Artículo 81 dispone, de manera expresa, que los contratos mercantiles, *"en todo lo relativo a sus requisitos, modificaciones, excepciones, interpretación y extinción y a la capacidad de los contratantes, se regirán, en todo lo que no se halle expresamente establecido en este Código o en leyes especiales, por las reglas generales del derecho común"*.[92] Entiéndase, el Código Civil.

En lo que respecta a los términos prescriptivos para instar acciones judiciales, el Código de Comercio, además de darle un carácter fatal a sus términos,[93] se distingue por promover períodos prescriptivos cortos.[94] Estos términos cortos responden a un claro propósito del derecho mercantil de no entorpecer las relaciones comerciales.[95]

En lo aquí pertinente, el Artículo 946 del Código de Comercio dispone que:

> Las acciones procedentes de letras de cambio se extinguirán a los tres (3) años de su vencimiento háyanse o no protestado.
>
> Igual regla se aplicará a las libranzas y pagarés de comercio, cheques, talones y demás documentos de giro o cambio y a los cupones e importe de amortización de obligaciones emitidas conforme a este Código.[96]

Este término de tres (3) años solo admite interrupción si la misma es hecha mediante demanda judicial, reconocimiento del

---

[90] *Pacheco v. Nat'l Western Life Ins. Co.*, *supra*, pág. 65.
[91] *Íd.*, pág. 66.
[92] Artículo 81 Código de Comercio. 10 LPRA sec. 1301.
[93] Artículo 939 Código de Comercio.10 LPRA sec. 1901.
[94] Véanse, Artículos 942, 945, 947, 948, 949 y 950 del Código de Comercio. 10 LPRA secs. 1904, 1907, 1909, 1910, 1911 y 1912.
[95] *Paine Webber v. First Boston*, 136 DPR 541, 547 (1994).
[96] Artículo 946 Código de Comercio. 10 LPRA sec. 1908.

deudor y la renovación del documento que otorga un derecho al acreedor.[97]

De otra parte, las disposiciones de prescripción de nuestro Código de Comercio se derivan de las disposiciones análogas del Código de Comercio español. Bajo dicho cuerpo normativo, los tratadistas han reconocido que los preceptos de prescripción de dicho Código de Comercio señalan plazos más cortos que los correlativos del Derecho Civil.[98]

Consistente con lo anterior, el Tribunal Superior de Puerto Rico ha resuelto que dicha interpretación es extensiva a las disposiciones correspondientes del Código de Comercio de Puerto Rico.[99] Esto es, los artículos que reúnen las disposiciones de prescripción mercantil no constituyen un conjunto de normas capaces de considerarse como una doctrina general, sino que son normas aisladas de supuestos especiales. Por lo tanto, en ausencia de normas específicas de prescripción mercantil, el Código de Comercio establece que serán de aplicación las normas correspondientes del Código Civil.[100]

Es decir, cuando se trata de actos de comercio se debe recurrir al principio de supletoriedad, bajo el cual se deben agotar las fuentes del derecho mercantil antes de acudir al Código Civil porque si existe una norma derivada de una de esas fuentes, se trataría de una norma especial que prevalecería sobre la general.[101]

**-C-**

El Código Civil de Puerto Rico de 1930 (en adelante, Código Civil de 1930) es claro en materia de contratos.[102] Dicho cuerpo legal establece que *el contrato existe desde que una o varias personas*

---

[97] Artículo 941 Código de Comercio. 10 LPRA sec. 1903.
[98] *Mortensen & Lange v. S.J. Mercantile Corp.*, 119 DPR 345, 351 (1987).
[99] *Íd.*
[100] *Íd.*
[101] *Pacheco v. Nat'l Western Life Ins. Co, supra*, pág. 65.
[102] Los hechos que dan lugar al presente caso se desarrollaron durante la vigencia del *Código Civil de Puerto Rico* (1930).

*consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio.*[103]

El Código Civil de 1930 dispone que los contratos se perfeccionan por el mero consentimiento y desde entonces *obligan, no sólo al cumplimiento de lo expresamente pactado*, sino también a todas las consecuencias que según su naturaleza sean conforme *a la buena fe,* al uso y a la ley.[104]

Lo determinante es la concurrencia de los elementos constitutivos del consentimiento de las partes, un objeto cierto y la causa de la obligación que se establezca.[105] Las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes y deben cumplirse a tenor de estos.[106]

De otro lado, el Código Civil de 1930 establece que las acciones personales que no tengan un término especial de prescripción, prescriben a los quince (15) años.[107]

**-III-**

Aunque la **SLG Darcoli-Serra** plantea la comisión de tres (3) errores, coyunturalmente se resumen en que el **TPI** incidió al no reconocer en la *Sentencia Sumaria* apelada que el negocio jurídico habido entre los **Apelantes** y el **BPPR** es uno de naturaleza comercial, al que le aplican las disposiciones del Código de Comercio, *supra.*

Como foro intermedio estamos en la misma posición del **TPI** para considerar la moción de sentencia sumaria, sus anejos y la réplica del **BPPR**; e, igualmente la oposición y solicitud de sentencia sumaria con sus anejos de la **SLG Darcoli-Serra**; y, cualquier documento relacionado que obre en el expediente. Por lo cual,

---

[103] 31 LPRA ant. sec. 3371.
[104] 31 LPRA ant. sec. 3375. Énfasis suplido.
[105] 31 LPRA ant. sec. 3391.
[106] 31 LPRA ant. sec. 2994.
[107] 31 LPRA ant. sec. 5294.

determinamos que ambas partes cumplieron con los requisitos que les impone la citada Regla 36 de Procedimiento Civil.

A tono con lo antes dicho, procedemos *de novo* a incluir, enmendar, reformular y ordenar —de forma cronológica— las determinaciones de hechos materiales que hizo el **TPI** en la *Sentencia Sumaria* apelada, las cuales surgen del expediente y **no hay controversias materiales de hechos**:

1. El **5 de abril de 2005**, los **Apelantes**, a través de la entonces corporación **Don Minzoni** presentaron una **Solicitud de Crédito Comercial (Comercial Credit Aplication)** al **BPPR** por **$50,000.00** del producto bancario **FlexiLínea**, para WORKING CAPITAL – INVENTORY & ACCTS RECEIVABLES del restaurante italiano, *Pinoli.*[108]

2. El **6 de abril de 2005**, el **BPPR** aprobó la **Solicitud de Crédito Comercial (Comercial Credit Aplication**), para capital de trabajo a la entonces corporación **Don Minzoni** con una línea de **crédito comercial** por **$50,000.00** en la modalidad de reserva a la cuenta corriente **Flexicuenta #027-232867**, con una tasa de interés primario a razón de 4% fluctuante. Sujeto a un término anual para revisión, con una garantía ilimitada y continua de los **Apelantes**. Además, allí se convino que: "**Este financiamiento se regirá por un convenio de préstamo que incluirá, entre otros, los términos y condiciones antes mencionados**. Se podrán incorporar otros, que a nuestro mejor entender o a juicio de los abogados del Banco, se consideren necesarios al momento de redactar el contrato final para esta facilidad de crédito."[109]

3. Finalmente, el **7 de abril de 2005**, el **BPPR** le otorgó a la entonces corporación **Don Minzoni** la referida línea de **crédito comercial FlexiLínea** por **$50,000.00** en la modalidad de reserva a la cuenta corriente **#027- 232867** de la corporación, al interés primario de 4% fluctuante. Para ello, los **Apelantes** presentaron un **Certificado de Resolución Corporativa de Don Minzoni**, autorizando a su presidente, Christian Darcoli a obtener dicha línea de crédito comercial y firmada por la secretaria de la corporación, María L. Serra Collazo.[110] Además, en esa misma fecha, estos suscribieron un **Anejo al Contrato-Flexicuenta de Negocio**;[111] y, una **Garantía Ilimitada y Continua** en la que garantizaban personalmente la línea de crédito comercial obtenida por **Don Minzoni**.[112]

---

[108] Véase, Solicitud de Crédito Comercial (Comercial Credit Aplication) al **BPPR** de los **Apelantes** del 5/abril/2005. Entrada Núm. 59 de SUMAC, Caso Núm. SJ2023CV06854.

[109] Véase, Carta de Aprobación de Crédito Comercial del 6/abril/2005, en el último párrafo de la pág. 2 de 3. Entrada Núm. 55 y 59 de SUMAC, Caso Núm. SJ2023CV06854.

[110] Véase, Certificado de Resolución Corporativa de Don Minzoni del 7/abril/2005. Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854.

[111] Véase, Anejo al Contrato-Flexicuenta de Negocio del 7/abril/2005. Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854. **Cabe resaltar que no obra en el expediente el Contrato de Cuentas de Depósito del cual, el Anejo al Contrato-Flexicuenta de Negocio** forma parte.

[112] Véanse, Garantía Ilimitada y Continua del 7/abril/2005. Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854.

4. Mediante el documento intitulado, **Enmienda al Pagaré de la Línea de Crédito Flexilínea o al Contrato de Préstamo** con fecha del **20 de abril de 2011**, el **BPPR** le concedió a la entonces corporación **Don Minzoni** (Deudor), y a los **Apelantes** (Codeudores/Garantizadores) una enmienda a la **línea de crédito comercial FlexiLínea** por el mismo margen crediticio ($50,000.00), de manera que, solo se enmendó, el interés primario de 4%, a uno mayor de 5.50%.[113]

5. Ante la falta de pago de **Don Minzoni**, **12 de enero de 2018**, el **BPPR** canceló la **línea de crédito comercial FlexiLínea** de $50,000.00,[114] y conforme a lo convenido en la Carta de Aprobación de Crédito Comercial,[115] lo trató como el **Préstamo Comercial #101-2512785-8801** a la cuenta de **Don Minzoni**.

6. En un proceso extrajudicial, el **30 de abril de 2018**, se formalizó una primera transacción, a través de la unidad de mitigación de pérdidas ("loss mitigation") del **BPPR**, en virtud de la cual los **Apelantes** liquidaron los préstamos: núm. **0702824547** (hipotecario) y núm. **4549549013833971** (redi-equity).[116]

7. El **27 de agosto de 2019** el **BPPR** presentó la primera Demanda Núm. **SJ2019CV08745**, contra el **señor Darcoli Parrella,** la **señora Serra Collazo** y la **SLG Darcoli-Serra** sobre **cobro de dinero y ejecución de hipoteca**. En este pleito el **BPPR no incluyó ni reclamó el Préstamo Comercial #101-2512785-8801**.[117]

8. El **9 de febrero de 2021**, por primera vez, el Sr. Rafael M. De Sevilla, Comercial Credit Officer - Commercial Collections & W/O Support del BPPR, extrajudicialmente le informa, en una carta, vía correo, al **señor Darcoli Parrella** y la **señora Serra Collazo** que el **Préstamo Comercial #101-2512785-8801** otorgado a la corporación **Don Minzoni**, se encontraba en atraso y/o vencido. Se les informó que adeudaban $50,000.00 en principal, más $17,103.62 en intereses para un balance total de $67,103.62. También, se les ofreció alternativas de plan de repago, pero de no comunicarse en un plazo de 15 días, el **BPPR** acudiría al cobro del dinero por la vía legal.[118]

---

[113] Véase, Enmienda al Pagaré de la Línea de Crédito Flexilínea o al Contrato de Préstamo del 20/abril/2011. Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854.

[114] Véase, Historial de Pagos de Don Minzoni del Préstamo Comercial #101-2512785-8801 desde el 12/enero/2018 al 4/septiembre/2024; y, Carta en aviso de atraso y/o vencimiento de pagos al Préstamo Comercial #101-2512785-8801, firmada por el Sr. Rafael M. De Sevilla, Comercial Credit Officer - Commercial Collections & W/O Support del BPPR, fechada el 9/febrero/2021. Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854.

[115] Véase, el último párrafo, de la pág. 2 de 3, de la Carta de Aprobación de Crédito Comercial del 6/abril/2005. Entrada Núm. 55 y 59 de SUMAC, Caso Núm. SJ2023CV06854.

[116] Véanse, Payoff Statement BPPR-Mortgage Servicing, Núm. Préstamo **702824574**, PAYOFF STATEMENT GOOD THROUGH **5/1/2018**, **SHORT SALE**, fechado 30/abril/2018; y, BPPR-Servicio al Consumidor, **ACUERDO** de pago del Préstamo núm. **4549549013833971**, correspondiente a la cuenta **Redi Equity**, fechado 30/abril/2018. Entrada Núm. 61 de SUMAC, Caso Núm. SJ2023CV06854.

[117] Véase, la *Demanda*. Entrada Núm. 1 de SUMAC, Caso Núm. SJ2019CV08745. Véase, además, los párrafos 4 y 5 de la Contestación a Tercer Interrogatorio, juramentada por Rafael M. De Sevilla Rodríguez, Oficial del BPPR del 16/octubre/2024. Entrada Núm. 59 de SUMAC, Caso Núm. SJ2023CV06854.

[118] Véase, Carta en aviso de atraso y/o vencimiento de pagos al Préstamo Comercial #101-2512785-8801, firmada por el Sr. Rafael M. De Sevilla, Comercial Credit Officer - Commercial Collections & W/O Support del BPPR, fechada el 9/febrero/2021. Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854.

9. En un proceso extrajudicial, el **26 de noviembre de 2021** se formalizó una segunda transacción, a través de la unidad de mitigación de pérdidas ("loss mitigation") del **BPPR**, en virtud del cual los **Apelantes** liquidaron el préstamo hipotecario núm. **0702813858**.[119]

10. Luego de llegar a un acuerdo extrajudicial con los **Apelantes**, el **10 de diciembre de 2021**, el **BPPR** presentó una *Solicitud de Cancelación de Anotación a Demanda*, en el caso núm. **SJ2019CV08745**.[120]

11. El **13 de diciembre de 2021**, el **TPI** emitió una <u>Orden</u> en el caso núm. **SJ2019CV08745** en la que canceló la Anotación a Demanda.[121] En específico, dispuso:

En su consecuencia, el Tribunal [...] ORDENA al Registrador de la Propiedad, Sección de San Juan III, que proceda a CANCELAR:

1. La Anotación preventiva (Aviso de Demanda) de fecha 27 de agosto de 2019, expedido en el Tribunal de Primera Instancia, Sala de San Juan, en el Caso Civil número SJ2019CV08745, por concepto de Cobro de Dinero y Ejecución de Hipoteca, seguido por el Banco Popular de Puerto Rico, versus Christian Darcolli Parrella, et als, por la suma de $186,594.88, más intereses y otras sumas, anotado el día 30 de septiembre de 2019, al tomo Karibe de Sabana Llana, finca número 6105, Anotación A.

Se ORDENA a la Secretaria del Tribunal librar el correspondiente Mandamiento dirigido al Registrador de la Propiedad de San Juan, Sección III, para que dé cumplimiento a la presente Orden.[122]

12. Además, **13 de diciembre de 2021**, se emitió la *Sentencia Final* en la que concedió el desistimiento *sin perjuicio* presentado por el **BPPR** en el caso núm. **SJ2019CV08745**.[123]

13. El **11 de enero de 2023**, el **BPPR**, mediante representación legal *Rivera-Munich & Hernández*, reclamó extrajudicialmente, vía correo regular, al **señor Darcoli Parrella** y la **señora Serra Collazo** el pago de lo adeudado del **Préstamo Comercial #101-2512785-8801**. Indicó, que para esa fecha se adeudaba $50,000.00 en principal, más $25,122.11 en intereses para un balance total de $<u>75,122.11</u>.[124]

14. El **18 de julio de 2023**, el **BPPR** presentó una <u>segunda</u> y <u>nueva</u> *Demanda* de epígrafe (**SJ2023CV06854**), sobre **cobro de dinero** contra el **señor Darcoli Parrella**, la **señora Serra Collazo** y la **SLG Darcoli-Serra**, por no haber realizado el pago del principal adeudado ($50,000.00) ni de los intereses acumulados en el **Préstamo Comercial #101-2512785-8801** a la extinta corporación **Don Minzoni**.[125]

---

[119] Véase, Payoff Statement BPPR-Mortgage Servicing, Núm. Préstamo **702813858**, PAYOFF STATEMENT GOOD THROUGH **11/30/2021**, **SHORT SALE**, firmada el 23/nov./2021. Entrada Núm. 61 de SUMAC, Caso Núm. SJ2023CV06854.

[120] Véase, Entrada Núm. 17 de SUMAC, Caso Núm. SJ2019CV08745.

[121] Véase, Entrada Núm. 19 de SUMAC, Caso Núm. SJ2019CV08745.

[122] Esta orden fue notificada el 14 de diciembre de 2021. Véase, Entrada Núm. 20 de SUMAC, Caso Núm. SJ2019CV08745

[123] Esta sentencia fue notificada el 14 de diciembre de 2021. Véase, Entrada Núm. 21 de SUMAC, Caso Núm. SJ2019CV08745.

[124] Véase, Carta de Cobro de Préstamo #101-2512785-8801, del Bufete Rivera-Munich & Hernández, con fecha de 11 de enero de 2023. Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854.

[125] Véanse, la *Demanda* del caso SJ2023CV06854 y sus Anejos: **(1)** Anejo al Contrato-Flexicuenta de Negocio del 7/abril/2005; **(2)** Garantía Ilimitada y Continua del 7/abril/2005; **(3)** Enmienda al Pagaré de la Línea de Crédito Flexilínea o al Contrato de Préstamo del 20/abril/2011; y, **(4)** Carta de Cobro de

A tono con las catorce (14) determinaciones de hechos materiales incontrovertidas antes dichas, nos toca resolver si todavía prevalecen controversias de hechos consistes en si la deuda reclamada en el Préstamo Comercial #101-2512785-8801, es una de carácter mercantil o civil. Veamos.

El **BPPR** asevera que la línea de crédito no es comercial porque no cumple con el propósito dual establecido en el Artículo 243 del Código de Comercio, *supra*. El **TPI** coincidió con el **Apelado** y concluyó que los **Apelantes** no presentaron evidencia a tono con dicho Artículo 243 del Código de Comercio, referente al propósito dual de comprar un bien para revenderlo y obtener un lucro, por lo cual concluyó que se trataba de un acto civil y no uno comercial.

No tienen razón. Veamos.

De entrada, el mencionado Artículo 243 del Código de Comercio se encuentra en el Título VII-*Compraventa y Permuta Mercantiles, y de la Transferencia de Créditos no Endosables*. Nótese, que la controversia en el caso de epígrafe **no trata de una compraventa mercantil**, sino de una línea de crédito comercial, cuyo incumplimiento se tendría como un **préstamo comercial**. Tal naturaleza no fue reconocida por el **TPI**, a pesar de la prueba ofrecida por ambas partes.

**En primer orden**, el análisis debe realizarse al amparo del Artículo 229 del Título VI-*Préstamos Mercantiles* del Código de Comercio, el cual dispone que se reputará mercantil todo **préstamo** en el que concurran las siguientes circunstancias:

> **1)** si alguno de los contratantes fuera comerciante; y
> **2)** si las cosas prestadas se destinaren a actos de comercio.[126]

---

Préstamo #101-2512785-8801, del Bufete Rivera-Munich & Hernández, con fecha de 11 de enero de 2023. Entrada Núm. 1 de SUMAC, Caso Núm. SJ2019CV08745.
[126] 10 LPRA sec. 1651.

Recordemos que las circunstancias antes dicha deben interpretarse de forma copulativa para que aplique el Código de Comercio.[127]

En nuestro caso no hay controversia de hecho alguna de que ambas partes son comerciantes; a saber: **BPPR** división Comercial y la entonces corporación **Don Minzoni**. Por lo que se cumple con la primera circunstancia.

En cuanto a la segunda circunstancia, sobre: *si las cosas prestadas se destinaren a actos de comercio*, la documentación presentada por ambas partes apunta a:

**Primero**, la Solicitud de Crédito Comercial *(Comercial Credit Application),* del **5 de abril de 2005**, que los **Apelantes** le presentaron al **BPPR**,[128] lee en el acápite de propósito: WORKING-CAPITAL – INVENTORY & ACCTS RECEIVABLES, esto es para el tipo de negocio: UNLIMITED CORPORATION, refiriéndose a la corporación **Don Minzoni**, en la línea comercial de restaurante italiano; de nombre *Pinoli.*

**Segundo**, al examinar la Carta de Aprobación de Crédito Comercial del **BPPR** con fecha de 6 de abril de 2005, se tiene como deudor a la corporación **Don Minzoni**, a cual se le aprobó una **línea de crédito comercial para capital de trabajo** de $50,000.00 de reserva que estaría disponible en la cuenta comercial **Flexicuenta** núm. 027-23286-7, perteneciente a la referida corporación.[129] En particular, esta línea de crédito comercial contaba con un término de revisión anual (cada 30 de abril) y una tasa de interés primario al 4%. Además, estaba garantizada con una garantía ilimitada y continua del **señor Darcoli Parrella** y la **señora Serra Collazo**. Es

---

[127] *Pescadería Rosas, Inc. v. Lozada, supra*, pág. 477.

[128] Véase, Entrada Núm. 5 de SUMAC, Caso Núm. SJ2023CV06854, anejo de Solicitud de Crédito Comercial (Comercial Credit Aplication) al BPPR de los Apelantes del 5/abril/2005.

[129] Véanse, Carta de Aprobación de Crédito Comercial del BPPR con fecha de 6 de abril de 2005; y, Anejo al Contrato-Flexicuenta de Negocio del 7/abril/2005. Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854.

decir, los **Apelantes** responderían en caso de que el deudor, **Don Minzoni** no pagara al **BPPR**.[130]  Todavía más, para la otorgación de la referida línea de crédito comercial, el **7 de abril de 2005**, los **Apelantes** presentaron un **Certificado de Resolución Corporativa de Don Minzoni**, autorizando a su presidente, Christian Darcoli a obtener dicha línea de crédito comercial y fue firmada por la secretaria de la corporación, María L. Serra Collazo.[131]

**Tercero**, en las determinaciones de **hechos no controvertidas** que los **Apelantes** sustentaron bajo juramento,[132] indicaron que para el año 2005, el **BPPR** pactó con la entonces corporación **Don Minzoni**, para extenderle una línea de crédito comercial por la suma principal de hasta $50,000.00. El propósito de dicha línea de crédito era para capital de trabajo del restaurant de nombre *Pinoli*, que a su vez, operaba la referida corporación.[133] En ese sentido, sostuvieron que **Don Minzoni** tenía una cuenta comercial **027-23286-7** con el **BPPR** denominada, **Flexi-cuenta de Negocio**.[134] Por lo que dicha línea de crédito comercial funcionaba a manera de una reserva de fondos de la cuenta de cheques del negocio; de manera que, si **Don Minzoni** giraba y pagaba a sus suplidores, pero en ese momento no tenía fondos suficientes de los ingresos que percibía de sus operaciones diarias para cubrir el cheque girado, entonces se adelantaban los fondos de la referida línea de crédito, para cubrir la orden de pago. El **BPPR** a su vez, debitaba automáticamente de la misma cuenta, los pagos o abonos para acreditar a la cuenta de reserva, y reducía la deuda de la

---

[130] Véase, Garantía Ilimitada y Continua del 7/abril/2005.

[131] Véase, Certificado de Resolución Corporativa de Don Minzoni Inc., del 7/abril/2005. Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854.

[132] Véanse, *Oposición a la Moción de Sentencia Sumaria de la Parte Demandante y Solicitud de Sentencia Sumaria*, págs. 4-7 de 17; y, Declaración Jurada de los Apelantes del 17/enero/2025. Entrada Núm. 59 de SUMAC, Caso Núm. SJ2023CV06854.

[133] Véanse, Solicitud de Crédito Comercial (Comercial Credit Aplication) al BPPR de los Apelantes del 5/abril/2005; y, Carta de Aprobación de Crédito Comercial del 6/abril/2005. Entrada Núm. 59 de SUMAC, Caso Núm. SJ2023CV06854.

[134] Véase, Anejo al Contrato-Flexicuenta de Negocio del 7/abril/2005. Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854.

reserva. En garantía de la obligación mercantil asumida por **Don Minzoni**, el **BPPR** le exigió a los **Apelantes** —en ese entonces accionistas, Presidente y Secretaria de la Junta Directiva de la corporación— que otorgaran una garantía personal que los obligaba a responder personalmente en caso de incumplimiento;[135] por ello, el **Apelado** los ha demandado en este pleito de cobro de dinero en su carácter personal. En ese sentido, la **SLG Darcoli-Serra** reconoció que tras el paso de los huracanes Irma y María en 2017, las operaciones del restaurante *Pinoli* vinieron a mal y lamentablemente no se pudo cumplir con el compromiso asumido. Razón por la cual, el **12 de enero de 2018**, el **BPPR** canceló y dispuso por insoluta la **línea de crédito comercial**; y, en virtud de lo convenido en la Carta de Aprobación de Crédito Comercial,[136] lo trató como el **Préstamo Comercial #101-2512785-8801** a la cuenta de **Don Minzoni**.[137] Así, el **19 de febrero 2021**, el Sr. Rafael M. De Sevilla, Comercial Credit Officer - Commercial Collections & W/O Support del BPPR, les envió a los **Apelantes** la <u>Carta en aviso de atraso y/o vencimiento de pagos al Préstamo Comercial #101-2512785-8801</u>, de la cuenta de negocio de **Don Minzoni**. En la cual, les informó que para esa fecha adeudaban $50,000.00 en principal, más $17,103.62 en intereses para un balance total de $<u>67,103.62</u>.[138]

---

[135] Véase, Certificado de Resolución Corporativa de Don Minzoni Inc., del 7/abril/2005; y, Garantía Ilimitada y Continua del 7/abril/2005. Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854. Además, véase, las determinaciones de hechos incontrovertidas: a, b, c, d, e, f y g que obran en *la Oposición a la Moción de Sentencia Sumaria de la Parte Demandante y Solicitud de Sentencia Sumaria*, Entrada Núm. 59 de SUMAC, págs. 4-5 de 17, Caso Núm. SJ2023CV06854.

[136] Véase, Carta de Aprobación de Crédito Comercial del 6/abril/2005, en el último párrafo de la pág. 2 de 3. Entrada Núm. 55 y 59 de SUMAC, Caso Núm. SJ2023CV06854.

[137] Véase, Carta en aviso de atraso y/o vencimiento de pagos al Préstamo Comercial #101-2512785-8801, firmada por el Sr. Rafael M. De Sevilla, Comercial Credit Officer - Commercial Collections & W/O Support del BPPR, fechada el 9/febrero/2021. Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854.

[138] Véase, Historial de Pagos de Don Minzoni del Préstamo Comercial #101-2512785-8801 desde el 12/enero/2018 al 4/septiembre/2024; y la Carta en aviso de atraso y/o vencimiento de pagos al Préstamo Comercial #101-2512785-8801, firmada por el Sr. Rafael M. De Sevilla, Comercial Credit Officer - Commercial Collections & W/O Support del BPPR, fechada el 9/febrero/2021. Entrada Núm. 55 de SUMAC, Caso Núm. SJ2023CV06854.

Nótese, que las tres (3) instancias antes expresadas, demuestran que la línea de crédito comercial (y posterior Préstamo Comercial #101-2512785-8801) otorgada a la corporación **Don Minzoni** por el **BPPR,** debían destinarse a **actos de comercio** en la operación diaria del restaurante *Pinoli.*

Ahora bien, es precisamente en este punto que se traba la controversia de hechos principal, consistente en si dicha línea de crédito comercial y posterior Préstamo Comercial #101-2512785-8801 se destinaron a actos de comercio, conforme a la segunda circunstancia del citado Artículo 229 del Código de Comercio. [139]

En conclusión, devolvemos el presente caso al **TPI** para que en un juicio examine si dicha línea de crédito comercial y posterior Préstamo Comercial #101-2512785-8801 se destinaron a actos de comercio. Así pues, *"[q]uien invoque el Código de Comercio tiene la carga de la prueba sobre su aplicabilidad".*[140]

Por último, no debemos pasar por alto la argumentación que hace la representación legal del **BPPR** en su *Alegato en Oposición* sobre la defensa de prescripción (segundo señalamiento de error) presentada por los **Apelantes** en el recurso de *Apelación* ante nos. En específico, en la pág. 10 de su alegato, el **BPPR** expresó, y citamos:

> El fundamento principal de los apelantes para sustentar la defensa de prescripción lo es la alegación errónea de que el Pagaré Línea de Crédito FlexiLínea es un instrumento negociable sujeto a las disposiciones de la Ley de Transacciones Comerciales, 19 L.P.R.A. §401, et seq. (LTC).[141]

Sin embargo, una lectura detenida del recurso de apelación de la **SLG Darcoli-Serra** no demuestra que estos hayan fundamentado su reclamo al palio de la citada **Ley de Transacciones Comerciales**; incluso, ni la *Sentencia Sumaria*

---

[139] 10 LPRA sec. 1651.
[140] *Pescadería Rosas, Inc. v. Lozada*, 116 DPR 474, 481(1985); *Reece Corp v. Ariela Inc.*, 122 DPR 270, 280 (1988).
[141] Véase, además, las págs. 11, 12, 13 y 14 del *Alegato en Oposición.*

apelada, ni en ningún escrito ante el **TPI** discuten o hacen referencia a dicha ley. Este foro intermedio encontró que —tanto en instancia como ante nos— la argumentación de los **Apelantes** descansa enteramente en las disposiciones del Código de Comercio, *supra*. De hecho, la única parte que trae a nuestra atención la **Ley de Transacciones Comerciales** —por primera vez— en esta etapa apelativa es el propio **BPPR**. Sobre este particular, es norma de derecho apelativo, firmemente establecida, que al revisar una determinación de un foro inferior, no podemos considerar nuevas teorías o asuntos nuevos presentados por primera vez ante este foro intermedio.[142] En otras palabras, argumentos que pudieron haber sido presentados y que no fueron sometidos ante el foro primario no podrán ser evaluados por los tribunales apelativos.[143] Por tal razón, no habremos de considerar dichos planteamientos.

### -IV-

Por los fundamentos antes expuestos, **revocamos** parcialmente el dictamen apelado y **devolvemos** el caso de epígrafe para la celebración del juicio, conforme a la controversia de hechos aquí esbozada.

Lo acordó el Tribunal y lo certifica la secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[142] *Vera Morales v. Bravo Colón*, 161 DPR 308 (2004); *Ortiz Torres v. K & A Developers, Inc.*, 136 DPR 192 (1994); *Autoridad Sobre Hogares v. Sagastivelza*, 71 DPR 436 (1950).
[143] *Ortiz Torres v. K & A Developers, Inc., supra.*